Annabell Marshall, Appellee, v. Metropolitan Life
Insurance Company, Appellant.

Gen. No. 44,630.

500

(NIEMEYER, J., dissenting.)

Opinion filed May 16, 1949.   Released for publication May 27, 1949.

ECKERT & PETERSON, of Chicago, for appellant; OWEN RALL, WILLIAM A. CANNON, and WALTER P. STEFFEN, all of Chicago, of counsel.

ALFRED ROY HULBERT and DAVID H. GREENBERG, both of Chicago, for appellee.

MR. JUSTICE TUOHY delivered the opinion of the court.

Plaintiff Annabell Marshall, as beneficiary, sued defendant to recover on two policies of life insurance issued by defendant on the life of Frank H. Marshall, plaintiff's deceased husband. ·From a superior court judgment for $8,900 on a verdict, defendant appeals.

The first policy, dated March 3, 1944, was in the sum of $6,000, and the second, dated March 20, 1944, was in the sum of $2,000. The insured died on February 4, 1946, within the contestable period.

The company defends on the ground that both policies were avoided by material misrepresentations made in answer to certain questions in the written application for insurance. The questions and answers are:

Question No. 11 (b): "Have you ever had any ailment or disease of the Heart or Lungs?"

Answer: "No."

Question No. 12 (g): "Have you consulted a physician for any ailment or disease not included in your above answers?"

Answer: "Yes. Influenza—three or four days, January, 1940—mild—Good results. Dr. ?"

Question No. 13: "What clinics, hospitals, physicians, healers or other practitioners, if any, not named above, have you consulted or been treated by, within the past five years? If none, so state."

Answer: "None."

On December 30, 1943, Marshall was attended in his home for an illness, the symptoms of which were nausea and vomiting. Between the third day of March 1944, when the application was made, and the 22nd day of March, when the first policy was delivered and the second policy ordered, Marshall suffered an illness which was diagnosed as heart disease. Although no formal application was made for the second policy, upon its delivery, April 4, 1944, the insured signed a document designated an "Application Amendment."

As to the first policy, plaintiff maintains that whether or not the failure to disclose the illness of December 30 and the statement that he had not been treated by a doctor within the past five years materially increased the hazard insured against, was, under all the facts and circumstances, a question for the jury to determine, and that by their verdict they determined the question in accordance with plaintiff's contention. Defendant contends that the illness of December 30 was a gall bladder attack; that, as such, the undisputed testimony proved it was material to the risk, and that the failure to disclose the condition in answer to question No. 12 (g) and the positive statement by Mr. Marshall that he had not seen a physician in the past five years, in answer to question No. 13, was a material misrepresentation sufficient to avoid the policy as a matter of law.

As to the second policy, plaintiff maintains that its issuance was not preceded by an application and that no misrepresentations of any kind were made with reference to it. Defendant contends that there was, in ef-

fect, a renewal of the questions and answers of the original application by virtue of the "Application Amendment," and that being so, not only questions Nos. 12 (g) and 13, but question No. 11 (b) was also falsely answered, because of the heart condition discovered after the signing of the application, but before the execution of the amendment. Defendant also complains of errors in instructions given to the jury on behalf of plaintiff.

In view of the questions raised, it is necessary to consider the evidence at some length. Frank Marshall and an associate in the beer business spent the early evening of December 30 drinking together, after which they had dinner. During the night Marshall complained of being ill to his stomach, vomited several times, and in the morning Dr. H. Hoyt Cox was called to the home to attend him. Dr. Cox had never seen Mr. Marshall before this occasion and never saw him again; at the trial he did not remember what he did in making the examination, but he left a prescription to be filled. The next day Mrs. Marshall called Dr. Cox and told him that Mr. Marshall was all right. It also appears that Craig Dennison, Mr. Marshall's companion on the party of the night before, was also taken ill during the night with a stomach complaint similar to that suffered by Marshall. It does not appear that Marshall ever again had a recurrence of this type of illness.

The evidence of gall bladder attack, upon which the defendant relies, appears in the testimony of Dr. Cox, who produced an office record showing a call upon Frank Marshall on December 30 and containing the notation "gall bladder attack." This card was permitted to go into evidence without objection, although the doctor specifically stated that he had no independent recollection of the call on Mr. Marshall and that the card did not refresh his recollection as to the call. Upon cross-examination the doctor stated that he had never seen Mr. Marshall before the night

in question; that the words "gall bladder attack" on his record were not written by him, but by his nurse or secretary; that he did not know what he did in making the examination; that he does not remember whether Mr. Marshall was vomiting; that he had no recollection of this case; that that night's call was the last he heard of him. He says, "But so far as this man was concerned, I have no recollection of this case. As to whether there was any reason why I didn't go back after diagnosing this as a gall bladder attack, I have no recollection of this case whatsoever. I told you that. As to whether I prescribed for him, unquestionably I did. As to whether I remember what I gave him, I have no recollection of this case whatsoever." If this card is to be taken as proof of a definite diagnosis of gall bladder attack, then plaintiff has been deprived of her right of cross-examination, because the doctor who is alleged to have made the diagnosis of gall bladder attack, when produced on the witness stand, was unable to substantiate the record by any recollection whatsoever of the occurrence. If it were the doctor's opinion at the time that he took the stand that Marshall had suffered this attack, then the plaintiff was entitled to cross-examine him fully as to the findings and the reasons that entered into the diagnosis. This the plaintiff was unable to do by virtue of the doctor's position that he had no recollection whatsoever of the transaction. Under these circumstances, we attach no probative value to this card, particularly where the report was so clearly incompetent as evidence. Where a witness can testify that a private report or document made by him at the time of the occurrence refreshes his recollection, the document or report may *only* be used for that purpose, *and is not otherwise admissible in evidence. Village of Broadview v. Dianish*, 335 Ill. 299; *People v. Zalimas*, 319 Ill. 186.

Defendant argues that the prescription which the doctor supplied was that which he customarily used for gall bladder attacks. The ingredients of this pre-

scription might have been used for many illnesses other than gall bladder, and while it might have been corroborative had the doctor testified positively to a diagnosis of gall bladder attack, in the absence of underlying proof we do not feel the circumstance lends any support to defendant's contentions.

Defendant argues that "the issue here is not whether the insured had a gall bladder attack," but that "the policies are both avoided because the insured denied consultation with and treatment by Dr. Cox only nine weeks before the date of the application," and that "this misrepresentation was shown to be material as a matter of law." The issue, as we view it, is whether or not the insured suffered, prior to submitting his application for insurance, from an illness, by whatsoever medical name it may be called, of such severity that a misrepresentation concerning it materially affected the risk. It was properly within the province of the jury to determine to what extent it materially affected the risk, especially in the light of the testimony of Dr. Cox, defendant's witness, who stated that a gall bladder attack is one that is acute and sudden, one of those things that comes on suddenly and then passes away after proper remedies, and that it is not something that is damaging to the constitution. Defendant says that the misrepresentation was material to the risk and was so proved as a matter of law because the undisputed testimony of three doctors was to the effect that the illness suffered by Marshall on December 30 was material to the risk. However, these doctors were testifying to a hypothetical case based upon a diagnosis of gall bladder attack. If there was no gall bladder attack, then there is no testimony in this case on behalf of defendant that there was any illness material to the risk. The rule as to whether or not the misrepresentations contained in an application are material to the risk is stated as follows in *Hancock v. National Council Knights & Ladies of Security*, 303

Ill. 66, at page 71: ''Whether statements of an application made as incidental and inducement to a contract are material may be the subject of evidence and raise questions of fact unless they are of such a nature that all persons would agree that they are or are not material. Whether a representation is material is determined by the question whether reasonably careful and intelligent men would have regarded the fact stated as substantially increasing the chances of the event insured against, so as to cause a rejection of the application or different conditions.'' It would seem to us, therefore, that the question of whether or not the illness from which Marshall suffered on December 30 materially affected the risk was an ultimate question of fact for the jury to decide. We believe that the question was properly submitted to the jury and we are not disposed to interfere with their verdict.

The case at bar is materially different on the facts from the cases relied on by defendant. In the case of *Weinstein v. Metropolitan Life Ins. Co.*, 389 Ill. 571, three life insurance policies which issued on successive dates were involved, the first one being for $1,500, the second for $8,500, and the third for $5,000. There was a jury verdict for $1,500 on the first policy. The trial court entered a judgment notwithstanding the verdict for an additional $5,000 which was reversed by the Appellate Court, and the judgment of the Appellate Court was affirmed by the Supreme Court. It is significant that the $1,500 verdict was permitted to stand. The $1,500 policy was issued upon a representation that the plaintiff had not been attended by a physician within the last five years, although he had prior to that time and within the five year period suffered a dizzy spell while playing handball, complained of chest pains and consulted a doctor. The second policy was issued upon the same representation, although between the dates of the issuance of the first and second policies Weinstein had been a patient at the Mayo Clinic

at Rochester, Minnesota, where his condition was diagnosed as duodenal ulcer and infected tonsils, and was later seen by a doctor in Chicago. The third policy was issued upon the same representations, although between the dates of the issuance of the second and third policies, he had undergone an operation for tonsillitis and had seen several doctors. He died on April 1, 1938 of angina pectoris. In the *Weinstein* case the jury's verdict as to $1,500 was affirmed, notwithstanding the fact that Weinstein had testified that he had not consulted any physician for the prior five years when as a matter of fact he had. Apparently the jury considered this ailment so inconsequential as not to have materially increased the risk, and the courts affirmed the verdict. As to the two subsequent applications wherein false representations appeared, these representations were made after lengthy hospitalization and a positive diagnosis of duodenal ulcer and an operation for tonsillitis. In the instant case there was no definite proof of a gall bladder attack, the only proof bearing on the subject being that a doctor had been called to treat an ailment the nature of which, from all the facts in the record, is very uncertain. The jury in the instant case apparently considered, as did the jury in the *Weinstein* case, that the illness was not of sufficient importance as to materially increase the risk.

We have examined the other cases cited where the questions of doctors' attendance and hospitalization were misrepresented, and in each of these cases find that there was positive evidence of a serious, and in most cases incurable, disease. In *Western & Southern Life Ins. Co. v. Tomasun,* 358 Ill. 496, the insured had been treated for cancer within the five year period, had been hospitalized for weeks, and had undergone a major operation for cancer of the cervix of the uterus, with metastasis (spreading) to the bowel and bladder, six months before the application for insurance. In

*Continental Assur. Co. v. McCarty,* 302 Ill. App. 10, the insured had been suffering for three years from chronic nephritis (kidney trouble) with hypertension (high blood pressure), and had been treated by three different physicians for the disease. In *Krajewski v. Prudential Ins. Co.,* 305 Ill. App. 64, the insured had been hospitalized for treatment of cancer, and upon his discharge was suffering from cancer lesions in his spinal cord, with evidence of disfunction of the legs due to lesions. In *Traut v. Pacific Mut. Life Ins. Co.,* 321 Ill. App. 374, the insured had suffered from an injury or disease to his legs which caused his weight to drop from 175 pounds to 150 pounds in a year; was under the care of four different doctors, one for nine months; was confined to a hospital; and had suffered for years from sciatica, diagnosed as sciatic neuritis. In *Hamberg v. Mutual Life Ins. Co. of New York,* 322 Ill. App. 138, the insured was suffering from pronounced symptoms of heart disease. In *Cox v. Equitable Life Assur. Society of United States,* 333 Ill. App. 207, the insured had been operated on and his gall bladder removed, was subsequently treated for disease of the pancreas, and had an enlarged liver for which he received hospital treatment.

On the question of the second policy the following facts appear: The first policy was delivered to the plaintiff on March 22, 1944. At that time the agent who delivered the policy produced a second policy which was in the amount of $5,000. This policy had not been applied for and there had been no conversation with reference to it between the company's agent and Marshall until it was presented to the insured on March 22. He refused to take the additional $5,000 (notwithstanding the fact that he was then aware of the heart condition), but after some discussion with the agent agreed to take $2,000 of the amount. The agent's testimony on this score is as follows: "Well, the fact remains that I had the $5,000 policy and I

wanted Mr. Marshall to take the additional five which he refused. Then I compromised with him, asked him if he would consider taking some part of it and he agreed to take the $2,000. He didn't sign any new application. There is no need for a new application to be signed when a policy is done. Just send the old policy back and ask the company to change the amount of the insurance to what we see fit or the applicant decides to take. He originally had signed an application.''

Later, on April 4, the $2,000 policy, which was issued on the basis of the original application, was delivered to the insured, and at the time of the delivery the insured signed a document termed ''Application Amendment'' on the printed form of the insurance company, which, after identifying the policy and the insured, stated:

''To the Metropolitan Life Insurance Company:

The undersigned hereby amends the application for Life insurance made to your Company on the date stated above; to make it the application for the above numbered policy on the Whole Life Paid Up at Age 85 plan with Disability Waiver and War-Aviation Prov. in the amount of $2,000 without affecting its use as the application for Policy No. 14 977 598A.

These amendments and declarations are to be considered as a part of the said application and subject to the agreements, covenants, and statements therein contained. The said application, together with these amendments, is to be considered as the basis of and as a part of the contract of insurance. The said application, as amended, is correct and true, and I hereby ratify and confirm the statements therein made as of the date hereof.

Signed and dated at Chicago this 4 day of April, 1944.''

In the interim between the making of the application for the $6,000 policy and the delivery of the $2,000 policy, Marshall had been attended by several doctors and pronounced to be suffering from a heart condition diagnosed as coronary thrombosis. Plaintiff offered to prove that at the time the $2,000 policy was ordered Marshall advised the agent of the insurer who solicited the policy of this fact. Objection was made by the defendant to this offer of proof, and for reasons not clear to us the objection was sustained.

It is the position of the insurance company that the language of the above amendment of the insured's original application is clear, certain and unambiguous, and susceptible of only one meaning. In their brief they say: "Applying to the words their ordinary meaning, Mr. Marshall was telling the company that the statements he made in his application of March 3rd (and which on that date he had certified to be full, true and complete) are still full, true and complete as of April 4th." It is the contention of the plaintiff that Marshall was ratifying and confirming as of April 4 the answers he gave on March 3. He was again stating as of the latter date that they were true and correct *when given.*

That the insurance company intended by this so-called "Application Amendment" to procure from the insured representations as to his condition of health on the date of delivery of the insurance policy may well be the fact, but if the language of the insurance policy is susceptible to two interpretations, the question of intention is not germane, and that interpretation which will not defeat the insured's claim will be adopted. *Hancock v. National Council Knights & Ladies of Security, supra.*

No new application was submitted as a basis for the issuance of the second policy. The company could by appropriate language have requested the insured to

represent that his physical condition was the same on the date of the delivery of the second policy as it was at the time the original application was made; or that no change had occurred in his physical condition in the interim which would cause him to answer any of the questions differently on April 4 than he did on March 3. The controverted form contains no such certain language. It says, substantially, that the application on which the first policy was issued is amended to make it the application for the second policy, without affecting its use as the application for the first policy. The insured then represents that "the said application, as amended, is correct and true, and I hereby ratify and confirm the statements therein made as of the date hereof." The insured layman was entitled to conclude from this language that he was ratifying and confirming something that he had said on a prior occasion. He did not state or necessarily imply that all which had been said on the prior occasion continued to be true and was true on the later date. In Webster's dictionary, the primary meaning given to the word "ratify" is "to confirm." In its clearest connotation, "ratify" means to "confirm" or "approve" of something that has *already been said or done*. The same dictionary gives as a primary definition of the word "confirm" to "make firm or firmer"; "to strengthen." The insured was entitled to believe, considering these words their ordinary lay meaning, that he was making firm or firmer *by repetition* the questions and answers which he had made on the prior occasion.

We think the language of the "Application Amendment" ambiguous and susceptible of more than one interpretation, and it is our opinion that there was no representation made on April 4 that the insured's physical condition was the same as it was on the earlier date, nor that he had seen no doctors or suffered no disability in the interim between the date that

the application was made and the so-called "amendment" was signed.

■ Defendant complains of the submission to the jury of four instructions numbered P–1, P–2, P–3, and P–4. The error complained of in each of the instructions is that they in effect inform the jury that the burden in the instant case was upon the insurance company to prove by a preponderance or greater weight of all the evidence that Marshall made false statements of fact and that at the time such statements were made Marshall knew the same to be false. The position of the defendant is that if the representations were material to the risk and relied upon by the company, it is immaterial whether or not the insured knew the misrepresentations to be false. It is unnecessary to consider the question of whether or not scienter is a necessary element for the insurer to prove for the reason that the pleadings in this case were predicated upon the theory that it was. In its answer, wherein the affirmative defenses are set forth, defendant, in paragraph eight thereof, after setting forth the questions and answers which were allegedly untruthfully answered, states, "and defendant further states that the answers to the questions as above set forth are untrue and false and were known by the said Frank H. Marshall to be untrue and false, and that the said Frank H. Marshall made the following certification to the questions aforesaid" etc. The instructions were based upon the issues as formed by the pleadings in this case, and it is elementary that the defendant is bound by the theory upon which it pleads and tries its case.

For the foregoing reasons the judgment of the superior court of Cook county is affirmed.

*Affirmed.*

FEINBERG, P. J., concurs.

NIEMEYER, J., dissents. The undisputed material facts are: December 30, 1943, insured was treated by Dr. Cox for a gall bladder attack. March 3, 1944, he

applied for the first, or $6,000 policy involved herein and did not disclose the treatment by Dr. Cox in answering questions calling for that information. March 10 insured was attended by Dr. Miller, who found him suffering from a strep throat and a cardiac condition. An electrocardiogram taken March 14 at Dr. Miller's suggestion showed ventricular muscular damage. March 22 insured was examined by Dr. Brams, a heart specialist recommended by Dr. Miller. Insured gave a history of pain in the region of the heart for about a year past, shortness of breath on exertion in the fall of 1943, and an attack of nausea and vomiting about two months before the examination, which he had been told was a gall bladder attack. Based on the history given, a fluoroscopic examination of the patient and Dr. Brams' own interpretation of the electrocardiogram previously taken, the doctor made a diagnosis of enlargement of the left ventricle, coronary sclerosis—hardening and narrowing of the coronary arteries which supply the blood to the heart—myocardial degeneration, that is, degeneration of the heart muscle or heart tissue itself, all pretty well developed over a period of months or years. Insured was informed of his condition. Later, on the same day, the first policy was delivered and arrangements made for the second policy. That policy was delivered April 4, without further medical examination of the insured. Attached to the policy was a photostatic copy of the application of March 3, 1944, and an "application amendment" signed and dated by the insured April 4, 1944. The original application was amended only to make it the application for both policies, there being no change in or supplement to the answers of the insured therein to inform insurer of the examination or treatment of the insured by physicians after March 3. The insured died February 4, 1946, from pulmonary embolism, due to coronary sclerosis of years duration and myocardial fibrosis (substantially the same as myo-

cardial degeneration) of years duration, and mural (cardiac) thrombi of 10 to 14 days duration. In the verified proof of death, which asks for the names and addresses of all physicians who attended the deceased during his last illness and during three years prior thereto, plaintiff did not make known the attendance of Drs. Cox, Miller and Brams.

Further undisputed material facts are : A stethoscope is used to determine the regularity of the heart, any abnormality, or a change in the heart tone that would indicate valvular disease. Changes within the heart arteries and heart muscles usually do not produce any significant change in the heart sound that would allow any help from the use of the stethoscope and a stethoscopic examination is not final in the heart condition suffered by the insured. Diagnosis of disease of the coronary arteries is based mainly on the information the patient gives the doctor and what is shown by an electrocardiogram. Information that a patient had had a gall bladder attack ten or eleven weeks before the examination would have a definite bearing upon a coronary condition and call for further investigation along medical lines. A person with a history of a gall bladder attack is not considered an insurable risk. The practice of insurance companies generally, where a gall bladder attack is stated on the application, is to reject within 2, 3, 4 or 5 years. There is a waiting period. What appear to be gall bladder attacks are frequently coronary conditions in the older ages, from 45 up (the insured was 52 years at the time of the first application), and call for supplementary investigation. A cardiogram is not ordinarily asked for. The condition shown by the electrocardiogram of the insured and each of the conditions found by Dr. Brams— the enlarged left ventricle, coronary sclerosis and myocardial degeneration—are serious. They are progressive and may cause death. A person suffering from any of these conditions is not an insurable risk.

The court rejects the testimony of Dr. Cox and the record produced by him as of no probative value, "particularly where the report was so clearly incompetent as evidence." The report used by Dr. Cox was made under his direction, he having dictated it to his secretary. The doctor had forgotten his visit to and treatment of the insured, and the record did not refresh his recollection. After examination of the record during an intermission, counsel representing the plaintiff withdrew his objection to the doctor's testimony and the record was received in evidence. Dr. Cox then testified that, looking at his record he was able to state that he made a diagnosis that the insured was suffering from a gall bladder attack; that he made all the tests that were necessary and that he could make in the home of the insured; that he found tenderness on the right side in the region of the liver or he would not have made the diagnosis shown on the record. The able and experienced counsel for plaintiff waived nothing in withdrawing his objection to the doctor's testimony and permitting the record to be received in evidence without objection. It sufficiently appears from the doctor's testimony that he believed that the record was true and correct when made. It was admissible in evidence. *People v. Greenspawn,* 346 Ill. 484, 492, 493; *People v. Harrison,* 384 Ill. 201, 206; *Diamond Glue Co. v. Wietzychowski,* 227 Ill. 338, 346, 347; *O. S. Richardson Fueling Co. v. Seymour,* 235 Ill. 319, 323; *Allegretti v. Murphy-Miles Oil Co.,* 280 Ill. App. 378, 391–393. The record was of the highest probative value, having been made by a disinterested person for use in any further treatment of the insured and before any controversy had arisen. It is corroborated. Plaintiff established on cross-examination that the prescription given the insured (copy of which was produced by plaintiff) was one of the doctor's "favorite prescriptions for that (gall bladder) condition." The insured understood that Dr. Cox had made a

diagnosis of gall bladder attack and accepted that diagnosis when seeking medical relief from Dr. Brams within three weeks after signing the application for insurance. Dr. Brams testified that the insured stated he had been told the nausea and vomiting was a gall bladder attack. Plaintiff, examined under section 60 of the Practice Act [Ill. Rev. Stat. 1947, ch. 110, par. 184; Jones Ill. Stats. Ann. 104.060], was asked, "Did you hear Mr. Marshall tell Dr. Brams that about two months before he had a gall bladder attack?" She answered, "Yes, we mentioned that."

Insured having been treated for a gall bladder attack within three months of his application for insurance, it is immaterial whether he had in fact suffered such attack. In *Tanner v. Prudential Ins. Co.*, 283 Ill. App. 210 (leave to appeal denied, 286 Ill. App. xlv), decided by the Second Division of this court, the insured, who died from cancer about 14 months after the policy was issued, had been treated at a clinic for eye trouble from June to August 1930; an examination of a small part of the tissue behind the eye did not indicate cancer; after ten X-ray treatments, ending in August 1930, the eye was apparently all right and the doctor concluded that whatever had caused the trouble had disappeared; he then told the insured that "the eye looked perfectly normal and was like a normal eye"; October 4, 1930, the insured signed an application for insurance in which he stated that he had never had medical or surgical treatment in a hospital or sanitarium and had not been attended by a physician for the past three years. In stating the issue presented, the court said (216, 217):

"Regardless of whether or not Tanner was afflicted with a cancer when he answered the questions and signed the application on October 4, 1930, and, regardless of whether or not he knew that he was so afflicted, the real question presented for our determination is whether Tanner answered truthfully the questions in

his application for insurance as to his previous condition of health and medical history or whether he was guilty of misrepresenting material facts in connection with same.

"It must be conceded that an insurance company has the right to decide whether it will accept a risk after knowing all the true facts. Defendant was denied the right to examine the hospital records as to insured's diseased condition and treatment, as well as his medical history, and it was further denied the right and opportunity to interrogate the physicians who had treated him and with whom he had consulted, because of the concealment by him of his previous condition of health and medical and hospital treatment."

The court, holding that ". . . the undisputed evidence shows conclusively that the answers to the questions were false and concerned material facts," reversed the judgment for plaintiff entered on the verdict. *Weinstein v. Metropolitan Life Ins. Co.,* 389 Ill. 571, involved a policy applied for and issued after adoption of the Insurance Code of 1937. Within a month prior to application for the policy, an examination of the insured in a clinic revealed evidence of a duodenal ulcer and infected tonsils. This examination was not disclosed in the application. About six months later the insured died from angina pectoris. The court said (578, 579):

"The obvious purpose of eliciting information concerning examination at a clinic or by a physician is to afford an insurer an opportunity of ascertaining pertinent medical data as to the current physical condition of an applicant to supplement information already in its files. Knowledge thus obtained effectively places an insurer in a position to decide what type of policy, if any, may be issued and the premium to be charged. This important provision should not be subject to defeat, at the whim of an applicant, by his mere denial of

the visits. An insurer, informed even of a possibility of duodenal ulcer, would hardly ignore the information and issue a standard insurance policy covering the life of one likely to be so afflicted. It follows that an insurer is entitled to a truthful answer with respect to observation and examination at a clinic or by a physician, and failure of an applicant to acquaint it with this information may well be material to the risk. That an ailment or malady, knowledge of which an applicant withheld from an insurer, was not actually the cause of death is not decisive against a finding of materiality. Materiality to risk may exist notwithstanding proof of fatality owing to another cause.''

In the instant case, disclosure of the attendance of Dr. Cox and the treatment given by him would have put the insurer on notice of the probability of a coronary condition in the insured and enabled it to make inquiry of Dr. Cox and to seek further information along medical lines, including what would have been revealed by an electrocardiogram. What was said in the *Weinstein* case with respect to the possibility of a duodenal ulcer, applies with equal force to a gall bladder attack, which is in fact frequently a coronary condition in persons of the age of the insured. The materiality of the misrepresentation as affecting the acceptance of the risk or the hazard assumed, must be proved by the testimony of witnesses experienced in insurance matters. It is not as a rule a question which the court or jury can determine from general knowledge or experience and without the aid of expert witnesses. In *Traders' Ins. Co. v. Catlin,* 163 Ill. 256, one of the questions involved was whether a change in the use of the insured building increased the hazard. In holding that the testimony of expert witnesses should have been admitted, the court (p. 268) quoted with approval from *Leitch v. Atlantic Mut. Ins. Co.,* 66 N. Y. 100, as follows:

" 'It is well settled that the testimony of experts, and especially of underwriters as such, is admissible upon the question of materiality of circumstances affecting the risk. This was so decided in *Lanagan v. Universal Ins. Co.* 1 Pet. 170. (3 Kent's Com. 284.) When evidence of this character is necessary, for the reason that the fact is not sufficiently obvious to enable the court to decide it without aid, the testimony is to be treated as the testimony of credible witnesses upon any other fact, and *if there is no conflict, the fact of materiality or immateriality must be held as all the witnesses testified.* . . .' " (Italics mine.)

The undisputed evidence shows the materiality of the treatment by Dr. Cox. The failure to disclose this treatment being material to the risk, the policy is avoided, even though the applicant acted through mistake or in good faith. *Weinstein v. Metropolitan Life Ins. Co., supra,* p. 577. Judgment notwithstanding the verdict should have been entered for defendant as to both policies.

There is a further reason applicable only to the second policy why judgment notwithstanding the verdict should have been entered for defendant as to that policy. As said in *Zitnik v. Burik,* 395 Ill. 182, 186, 187:

"The principles governing the interpretation and construction of insurance contracts do not differ from those controlling in other contracts. (*Capps v. National Union Fire Ins. Co.,* 318 Ill. 350; *Cottingham v. National Mutual Fire Ins. Co.,* 290 Ill. 26.) They must be construed according to the sense and meaning of the terms which the parties have used and if the language is clear and unambiguous it must be taken and understood according to its plain, ordinary and popular sense. (*Moscov v. Mutual Life Ins. Co.,* 387 Ill. 378; *Chicago National Life Ins. Co. v. Carbaugh,* 337 Ill. 483.) The courts cannot make a new contract by

supplying provisions nor can they give plain and unambiguous terms a distorted construction that will defeat the clear intent and purpose of the contract. *Crosse v. Supreme Lodge Knights of Honor,* 254 Ill. 80.''

The construction of the application amendment made the basis of and a part of the second policy, and particularly of the language ''The said application, as amended, is correct and true and I hereby ratify and confirm the statements therein made as of the date hereof,'' adopted by the court, renders the language quoted unnecessary verbiage. It makes the declaration that the application as amended is true, and the ratification and confirmation of the statements made in the application, a useless and merely repetitious act. It renders inoperative the words ''as of the date hereof.'' The amendment of the application of March 3, 1944, making it the application for both policies, reaffirmed the statements of the insured in that application as of its date without further act or declaration of the insured. The clear intent and purpose of the amendment was to make the application, as amended, speak as of the date of the application amendment and not as of the date of the application. The language employed clearly and unambiguously effects that purpose. The words ''The said application, as amended, is correct and true,'' are inconsistent with the construction that the application as amended was true only as of the date of the original application, March 3, 1944. ''Is'' denotes the present, that is, the date of the application amendment—April 4, 1944. Likewise, the ratification and confirmation of the statements in the application as of the date of the application amendment, is inconsistent with the construction that such statements are true only as of the date of the application. The statements made in the original application were false and untrue as of April 4,

1944, because of the failure to disclose the examinations and treatment of the insured by Drs. Cox, Miller and Brams. For this additional reason judgment should have been entered for defendant as to the second policy.

I do not concur in the views expressed in the opinion as to the instructions to which defendant objects. However, a discussion of these instructions would needlessly extend this dissent.