AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Plaintiff-Appellant, v. ROBERTA ENRIGHT, Indiv. and as Mother and Next Friend of Jane Doe, a Minor, *et al.*, Defendants-Appellees (Matthew S. Burnett *et al.*, Defendants).—AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Plaintiff and Counterdefendant-Appellee, v. ACE AMERICAN INSURANCE COMPANY, f/k/a Cigna Insurance Company, Defendant and Counterplaintiff-Appellant (Roberta Enright, Indiv. and as Mother and Next Friend of Jane Doe, a Minor, *et al.*, Defendants and Counterdefendants-Appellees; Midwestern Regional Medical Center, Inc., *et al.*, Defendants and Counterdefendants).

Second District Nos. 2—01—0630, 2—01—0653 cons.

Opinion filed November 1, 2002.—Rehearing denied December 4, 2002.

O'MALLEY, J., specially concurring in part and dissenting in part.

Eileen P. Lenhardt, of James M. Hoffman & Associates, of Vernon Hills, and Maria Dimeas Jensen, of James M. Hoffman & Associates, of Schaumburg, for American Family Mutual Insurance Company.

Fritz K. Huszagh, Terrence P. McAvoy, and Christine L. Olson, all of Hinshaw & Culbertson, of Chicago, for appellee Ace American Insurance Company.

John A. Kornak and Patrick Jennetten, both of Salvi, Schostok & Pritchard, P.C., of Waukegan, for appellee Roberta Enright.

James J. DeSanto and Vernon E. Morgan, both of DeSanto, Morgan & Mittelman, of Libertyville, for appellee North Shore Ultrasound, Inc.

JUSTICE BYRNE delivered the opinion of the court:

These consolidated appeals involve multiple declaratory judgment actions arising from an underlying complaint in which Roberta Enright, as mother and next friend of the minor, Jane Doe, sued Matthew C. Burnett and his employer, North Shore Ultrasound, Inc. (NSU), alleging that Burnett sexually assaulted Jane Doe while performing an ultrasound procedure. The trial court found that both American Family Insurance Company (American) and Ace American Insurance Company (Ace) owe a duty to defend NSU, but American's policy is primary, and that Ace owes a duty to defend Burnett. Midwestern Regional Medical Center, Inc. (Midwestern), and Burnett are not parties to the appeals. We affirm in part and reverse in part.

## FACTS

NSU provides technical support for the performance of ultrasound procedures by furnishing agents and employees to facilities, including Midwestern. Burnett was employed by NSU as a licensed ultrasound technician. On July 11, 1998, while performing ultrasound procedures on Jane Doe, Burnett sexually assaulted Jane Doe by placing his finger in her vagina against her will.

Enright filed a five-count complaint against NSU, Midwestern, and Burnett on December 2, 1999, for injuries incurred by Jane Doe. Count I alleges a cause of action for negligent hiring against NSU; counts II, III, and IV are directed against NSU and Midwestern and are not at issue on appeal; and count V alleges a cause of action for battery against Burnett. On June 30, 1999, Burnett pleaded guilty to aggravated criminal sexual abuse and thereafter was sentenced.

NSU tendered the defense of the lawsuit to its insurance companies. American issued to NSU a business owner's policy that provides general exposure liability coverage for business practices or activities of the firm. The Ace policy essentially provides coverage for professional malpractice claims. Both insurers denied coverage and filed declaratory judgment actions seeking a determination as to whether they owed a duty to defend NSU or Burnett. The insurers also filed several motions for summary judgment. Enright and NSU also filed motions for summary judgment.

After considering the summary judgment motions, the trial court found that American owes no duty to defend or indemnify Burnett; that American and Ace owe a duty to defend NSU, but American's policy is primary and Ace's policy is excess; and that Ace owes a duty to defend Burnett. Both American and Ace filed separate appeals from the trial court's judgments against them. We consolidated their appeals.

## ANALYSIS

■ The standard of review on appeal from the entry of summary judgment is *de novo. Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390 (1993). The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court and appropriate subjects for disposition by summary judgment. *Crum & Forster*, 156 Ill. 2d at 391.

■ In determining whether an insurer has a duty to defend its insured in an underlying lawsuit, the court must look to the allegations in the underlying complaint and compare these allegations to the relevant coverage provisions of the insurance policy. *Crum & Forster*, 156 Ill. 2d at 393. If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage provisions, then the insurer has a duty to defend the insured in the underlying action. *Crum & Forster*, 156 Ill. 2d at 393. If the insurer owes no duty to defend, then it owes no duty to indemnify because the duty to defend is broader than the duty to indemnify. *Crum & Forster*, 156 Ill. 2d at 398. Where the language of an insurance policy is clear and unambigu-

ous, it must be given its plain and ordinary meaning. *State Farm Fire & Casualty Co. v. Hatherly*, 250 Ill. App. 3d 333, 337 (1993).

## I. American's Duty To Defend NSU

We first address American's contention that the trial court erred in determining that American owes a duty to defend the underlying claim brought against NSU for negligent hiring. The Enright complaint alleges that NSU has a duty to exercise reasonable care in the hiring and retention of Burnett. It further alleges that NSU breached that duty in that it (1) failed to investigate and inquire about Burnett's prior criminal history; (2) knew or should have known at the time of hiring Burnett that he had pleaded guilty to the offense of disorderly conduct and had an active warrant for his arrest; (3) knew or should have known that Burnett was unfit for the position of sonographer because it allowed for unsupervised contact with minors; and (4) failed to adopt administrative review and to conduct adequate preemployment screening and reference verification before hiring Burnett.

The business owner's package policy issued by American to NSU states, in pertinent part, that American "will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies." The policy excludes coverage for intentional injury "(1) expected or intended from the standpoint of the insured" or "(2) arising out of sexual molestation *** inflicted upon any person by or at the direction of an insured." The policy also excludes coverage for the following:

> "PROFESSIONAL LIABILITY. We will not pay for damages due to bodily injury or property damage arising out of the rendering of or the failure to render professional services by any insured, who is a (an):
> 
> * * *
> 
> (4) nurse or X-ray or medical technician;
> (5) health care practitioner of any kind."

American argues that the act of hiring Burnett was intentional and therefore was not an "occurrence" within the meaning of the policy so as to provide coverage. "Occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." American relies on *Erie Insurance Co. v. American Painting Co.*, 678 N.E.2d 844, 846 (Ind. App. 1997), in support of its argument that, in the context of insurance coverage, the act of the employer in negligently hiring the employee is intentional, not accidental, and therefore there is no coverage. We disagree with this argument for several reasons.

■ First, the premise that the act of hiring is intentional is

inconsistent with Illinois law, which holds that negligent hiring is a tort separate from the employee's intentional conduct. See, *e.g.*, *State Security Insurance Co. v. Globe Auto Recycling Corp.*, 141 Ill. App. 3d 133, 136 (1986) (intentional tort of employer not covered; negligent hiring potentially covered).

■ Second, Illinois courts have focused on whether the *injury* is expected in determining whether an occurrence is an "accident." *Country Mutual Insurance Co. v. Hagan*, 298 Ill. App. 3d 495, 507 (1998). "[A]n occurrence which is defined as an accident involves the consideration of whether the *injury* was expected or intended from the standpoint of the insured." (Emphasis added.) *State Farm Fire & Casualty Co. v. Watters*, 268 Ill. App. 3d 501, 506 (1994). In Illinois, therefore, if an injury is not expected or intended by the insured, it is considered an accident. *Hagan*, 298 Ill. App. 3d at 508. There are no allegations in the underlying complaint that NSU intended to injure Jane Doe. Rather, Enright alleges that NSU was negligent in not adopting proper preemployment screening, reference investigating, and administrative review. American seems to focus on the employer's final decision to hire an individual, an act that is intentional, rather than on the processes involved before and after the individual is hired, acts that could be handled negligently.

Third, American also predicates its argument on the assumption that Burnett's intentional act is not a separate and distinct act from NSU's alleged negligent act. We find the case of *United States Fidelity & Guaranty Co. v. Open Sesame Child Care Center*, 819 F. Supp. 756 (N.D. Ill. 1993), instructive here. In *Open Sesame*, the insurer brought a declaratory judgment action seeking to determine whether, under the special multiperil policy, it owed a duty to defend the insured daycare center in an action brought by the mother of a child allegedly abused by the daycare's employee. The insurer promised to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *** bodily injury or *** property damage to which this insurance applies." *Open Sesame*, 819 F. Supp. at 757.

■ The court acknowledged those cases from other jurisdictions in which the courts refused to separate the employer's alleged negligence from the abuser's intentional conduct. *Open Sesame*, 819 F. Supp. at 759. However, the court believed that refusing to separate the employer's alleged negligence from the employee's intentional conduct would disregard the clear language of the insurance policy. "The policy excludes bodily injury or property damage expected or intended from the standpoint of the insured. In other words, only the insured's intentional conduct falls outside the ambit of the policy." (Emphasis

omitted.) *Open Sesame*, 819 F. Supp. at 760. The court believed that the other opinions also discounted the employer's independent acts that gave rise to the underlying alleged tort. The court reasoned that, in holding that the employee's intentional conduct places the insured's negligence outside the definition of "occurrence," the exclusion is read too broadly. Because the predominant purpose of an insurance contract is to provide coverage to the insured, the court concluded that the allegation of negligent hiring in the underlying complaint is an "occurrence" despite the employee's intentional conduct. *Open Sesame*, 819 F. Supp. at 760; see also *Montgomery v. Petty Management Corp.*, 323 Ill. App. 3d 514, 519 (2001) (under a theory of negligent hiring, the proximate cause of plaintiff's injuries is the employer's negligence in hiring the employee, rather than the employee's wrongful act); *Doe v. Shaffer*, 90 Ohio St. 3d 388, 738 N.E.2d 1243 (2000) (intentions of molester immaterial to determining coverage for alleged negligent hiring); *Silverball Amusement, Inc. v. Utah Home Fire Insurance Co.*, 842 F. Supp. 1151 (W.D. Ark. 1994) (allegations against insured determines duty to defend for negligent hiring of employee who sexually molested a minor; otherwise it would dissolve distinction between intentional and negligent conduct).

American argues that *Open Sesame* is not controlling because the definition of "occurrence" in that policy is different from the definition in American's policy. The two definitions of "occurrence " are identical except the definition in the *Open Sesame* policy contains the additional phrase "neither expected nor intended from the standpoint of the insured." *Open Sesame*, 819 F. Supp. at 757. We agree that this is a distinction without a difference. The additional language is superfluous because, as stated above, bodily injury that is expected or intended from the standpoint of the insured is not considered an accident under the policy here. See *Hagan*, 298 Ill. App. 3d at 508.

American argues that we should not follow the reasoning in *Open Sesame*, as it conflicts with *United States Fidelity & Guaranty Co. v. Jiffy Cab Co.*, 265 Ill. App. 3d 533, 541 (1994). In *Jiffy*, the court held that, in determining whether an act is covered by the policy, the court must look to the act of the individual who was hired and, if the act of the employee would fail to invoke coverage or is excluded by a provision of the policy, the claim for negligent hiring of that employee will not be deemed to invoke coverage. American contends that, because the allegations of negligent hiring are related to and interdependent on the allegations of Burnett's intentional act, there is no coverage for NSU.

In *Jiffy*, a passenger was fatally stabbed by a Jiffy cab driver after the passenger exited the cab following an argument over a driving

route. The policy provided that the insurer would pay all sums because of bodily injury "caused by an accident and resulting from the *** use of a covered auto." *Jiffy*, 265 Ill. App. 3d at 538. The court held that the act of leaving the vehicle and inflicting the battery was an event of independent significance that was too remote, incidental, or tenuous to support a causal connection with the use of the vehicle. The court also found that the battery of the passenger by the cabdriver was not the type of risk that the parties to the insurance contract reasonably contemplated would be protected by a general automobile liability policy. The court further held that coverage was not invoked for the claim against the cab company for negligent hiring because the policy did not cover the employee. *Jiffy Cab*, 265 Ill. App. 3d at 541-42.

■ We disagree with American that *Open Sesame* conflicts with *Jiffy Cab*. The court in *Open Sesame* addressed whether negligent hiring was an occurrence so as to invoke coverage. The issue raised in *Jiffy Cab* was whether the claim for negligent hiring was covered as arising out of the use of an auto. The court reasoned that, since the driver's act of stabbing the passenger was not covered by the policy because it did not result from the use of an auto, then the claim for negligent hiring was not covered under the policy either. *Jiffy Cab*, 265 Ill. App. 3d at 541-42.

The only similarity between *Jiffy* and the present case is that Burnett and the cab driver personally committed intentional acts that were excluded by the policies. Unlike in *Jiffy*, the type of risk involved here, negligent hiring, is the type of risk that the parties to the insurance contract reasonably contemplated would be covered by a general liability business policy. More importantly, we cannot adopt a general rule of law that holds that coverage is not invoked for an employer simply because the policy does not cover the employee for his intentional act. If we were to do so, we would ignore the independent negligent act of the employer that gave rise to the allegation in the underlying complaint. We also would disregard the clear intent of the policy to exclude intentional conduct on the part of the "insured."

■ In seeking to avoid coverage, American relies on two exclusions in its policy, one based on sexual molestation and the other based on professional services. The "professional services" exclusion bars coverage for bodily injury arising out of the rendering of or the failure to render professional services by an insured who is an X-ray or medical technician or a health care practitioner of any kind. American argues that this exclusion applies because the complaint alleges that Burnett was performing a "professional service" at the time of the incident. Again, American incorrectly continues to assert that the allegations of negligent hiring emanated from Burnett's criminal act and, therefore,

NSU is excluded from coverage. However, we reject this assertion because, for purposes of insurance coverage analysis, the focus must be on the allegations against NSU for negligent hiring, not the allegations against Burnett for sexual assault. Accordingly, we reject American's argument that this exclusion applies.

■ The policy also excludes damages due to bodily injury arising out of sexual molestation inflicted upon any person "by or at the direction of an insured." American argues that this exclusion bars coverage because the injury arose out of Burnett's sexual act. However, there are no allegations that NSU directed Burnett to sexually molest Jane Doe.

American argues that the use of the words *"an* insured" versus *"the* insured" is crucial because it means that the policy does not cover anyone for injuries arising out of sexual molestation regardless of the theory of liability asserted in the underlying complaint. American fails to recognize that the act of sexual molestation must be inflicted "by or at the direction of an insured" in order for the exclusion to apply. As stated above, the underlying complaint does not allege that NSU directed Burnett to sexually molest Jane Doe. Nor is it alleged that NSU sexually molested the minor. Accordingly, we also reject this argument.

■ We conclude that the allegations of the underlying complaint at issue here unquestionably seek to hold NSU liable for its own negligent conduct, a claim that falls within, or potentially falls within, the scope of coverage under the terms of American's policy. Accordingly, the trial court correctly found that American has a duty to defend NSU.

## II. Ace's Duty to Defend NSU

■ We next address whether Ace owes a duty to defend NSU. Ace contends that it owes no duty to defend NSU because the underlying allegations of negligent hiring, investigation, and supervision are not claims against NSU for "professional services." We agree.

The policy issued to NSU by Ace is entitled a "Professional/ Supplemental Liability Insurance Policy." The policy contains several sections. One section is entitled "Professional Liability Coverage." Under this provision, Ace promises to "pay all amounts up to the limit of liability" that the insured becomes "legally obligated to pay as a result of injury or damage" to which the insurance applies. The injury or damage "must be caused by a medical incident arising out of *professional services* by [NSU] or anyone for whose professional services [NSU is] legally responsible." (Emphasis added.)

The second section, entitled "Supplemental Liability Coverage," provides that Ace will "pay all amounts up to the limits of liability"

that NSU becomes "legally obligated to pay as a result of injury or damage. The injury or damage must occur in the course of providing [NSU's] *professional services*." (Emphasis added.)

The third section is entitled "Personal Injury Coverage." This section of the policy does not contain any promise by Ace to pay any amount that NSU becomes legally obligated to pay. Rather, it simply defines "injury, as respects only [NSU's] *professional services*," to include "assault, battery, mental anguish, mental shock or hallucination." (Emphasis added.)

The underlying complaint alleges, *inter alia*, that NSU breached a duty to exercise ordinary and reasonable care and was negligent when it failed to adopt appropriate administrative review or to conduct adequate preemployment screening and reference verification. The policy defines "professional services" to mean "those services you are licensed, trained, or being trained to provide within the allied health field specified in your application and approved by us for coverage." Unquestionably, Enright seeks damages against NSU for acts that were *not* taken in the course of providing professional services and were *not* drawn from NSU's professional training, skill, experience, or knowledge as sonographers. Put another way, the allegations in the underlying complaint are based on administrative acts that have nothing to do with NSU's professional training, skill, experience, or knowledge as a sonographer. See *Pekin Insurance Co. v. L.J. Shaw & Co.*, 291 Ill. App. 3d 888, 895 (1997) (focus must be on whether the claim is seeking to impose liability for acts taken in the course of the professional's training, skill, experience, or knowledge); see also *Mork Clinic v. Fireman's Fund Insurance Co.*, 575 N.W.2d 598 (Minn. App. 1998) (regarding allegations of employees's sexual abuse, clinic's negligence in hiring and supervising employee is in the nature of administrative actions that do not fall within ambit of policy provision of professional services); *Community Hospital at Glen Cove v. American Home Assurance Co.*, 171 A.D.2d 639, 567 N.Y.S.2d 122 (1991) (claim against hospital for negligent hiring, training, and supervision of physician accused of sexual abuse of patient does not constitute medical incident, which is defined as an act or omission arising out of furnishing of professional health care services).

The dissent asserts that, because Burnett injured Jane Doe while she was receiving an ultrasound, the injury occurred "in the course of providing professional services" and is therefore covered under the "Supplemental Liability Coverage" section. The dissent focuses on Burnett's intentional act rather than NSU's hiring practices, which are the subject of the underlying claim in the complaint. If NSU becomes "legally obligated to pay," it will be for negligent hiring, not

Burnett's intentional conduct. Because the negligent hiring did not occur in the course of rendering a professional service, there is no coverage under the supplemental liability coverage section or any other section of the policy. Accordingly, we respectfully disagree with the dissent.

Because we conclude that Ace has no duty to defend NSU, the decision as to which insurance policy is primary or excess is moot. Accordingly, the trial court erred in finding that Ace has a duty to defend NSU and in finding that Ace's policy is excess to American's policy.

### III. Ace's Duty To Defend Burnett

We next address whether Ace has a duty to defend Burnett. Ace raises three arguments: (1) Burnett is not covered by the policy because he is not a named insured; (2) even if Burnett is considered an insured, the allegations in the underlying suit do not involve a "professional service" or a "medical incident" as required by the policy; and (3) even if Burnett's act is considered to arise from or occur during the course of a professional service, Burnett's conduct is excluded from coverage because it was expected or intended, resulted from a willful violation of a statute imposing criminal penalties, and arose out of sexual abuse.

The professional liability policy issued by Ace to NSU is a malpractice policy that provides coverage for liability arising from errors and omissions that occur during the rendering of professional services. See *Crum & Forster*, 156 Ill. 2d at 392. The only named insured on the policy is NSU. Generally, "a corporation is only a legal entity and can act only through a person." *Shapiro v. DiGuilio*, 95 Ill. App. 2d 184, 192 (1968). This does not necessarily mean that insurance covering the corporation also covers its employees. See *Shapiro*, 95 Ill. App. 2d at 192 (policy specifically defined insured to include any executive officer, director, or stockholder while acting within the scope of his duties as such). In this case, the policy does not specifically define who are the insureds. Because the policy covers liability arising from errors and omissions stemming from professional services, it logically follows that those employees who provide these professional services could be considered insureds. However, we need not reach this issue because, assuming *arguendo* that Burnett is considered to be an insured under the policy, we agree with Ace that his act is excluded from coverage.

The professional liability section excludes coverage for an act "which was expected or intended" or an act "which is also a willful violation of a statute *** imposing criminal penalties." The supplemental liability section also excludes coverage for intentional acts. The

record establishes that Burnett pleaded guilty to and was sentenced for aggravated sexual assault. Without question, therefore, his act was intentional and a willful violation of a statute imposing criminal penalties, which is excluded from coverage.

Enright argues that exclusion J of the professional liability section of the policy requires Ace to defend Burnett because the claim specifically arose from sexual abuse. Exclusion J excludes from coverage:

> "[those] [c]laims arising out of physical abuse, threatened abuse, sexual abuse or sexual harassment, immoral or sexual behavior whether or not intended to lead to, or culminating in any sexual act, whether caused by, or at your instigation, or omission, or that of your employee, or any person. *However, notwithstanding the foregoing, you shall be provided with a defense against any claim or suit which may be brought against you for any such alleged act, provided that the defense shall be limited to the amount of the professional coverage. No damages shall be paid for you or on your behalf and no defense or appeal shall be provided when a judgment or final adjudication adverse to you establishes that such act or acts occurred.*" (Emphasis added.)

We agree that the policy initially requires Ace to defend Burnett for claims that arise out of sexual abuse. However, Enright ignores the final sentence, which provides that Ace need not defend if "a judgment" establishes that the sexual abuse occurred. Because a judgment adverse to Burnett established that the sexual abuse did occur, Ace has no duty to defend or indemnify Burnett.

Enright argues in favor of construing the policy as ambiguous in order to find coverage. Enright contends that exclusion J conflicts with the "Personal Injury Coverage" section, which "covers" claims of assault and battery. Enright misconstrues the intent of this section. There is no promise under this section to always provide insurance coverage for this type of injury. Rather, this section broadens only the definition of the word "injury" to include such acts as assault or battery.

Moreover, this section does not alter or conflict with any of the other sections of the policy. For coverage purposes, if the "injury" is defined to include battery or assault, the battery must be caused by a "medical incident arising out of a professional service" or it must "occur in the course of providing a professional service." This situation might arise when a sonographer injures a patient while performing the wrong test on a patient. In such a case, the patient could bring a claim against the sonographer for battery. The claim would be covered by the policy because it arose out of a professional service. It would not be excluded from coverage under the expected or intended exclu-

sion because, although the sonographer intended to provide the service, he did not intend the injury to result. Conversely, if it is proved that the sonographer intended to commit the battery, the claim would be excluded from coverage.

American argues that Ace intended to treat certain allegations of sexual abuse as professional incidents because exclusion J provides a duty to defend but limits the defense to the amount of professional coverage. American argues that, if Ace had intended that an act of sexual abuse could never be deemed a professional incident, then there would have been no reason to include language limiting the amount to the professional coverage limits. American maintains that any other conclusion would render exclusion J meaningless.

We note first that American has no interest regarding Ace's duty to defend Burnett because the trial court found that American owes no duty to defend Burnett and no party in these appeals has challenged that finding. In any event, we do not find that any of the terms used in exclusion J render it meaningless. The meaning of "professional incident" is not synonymous with "professional coverage." A "professional incident" is defined in the policy as any negligent act, error, or omission in the rendering of or failure to render professional services that results in damages. Although the term "professional coverage" is undefined, the term is placed in the "Professional Liability Coverage" section and, thus, the definition of professional coverage is intended to define the scope of the policy coverage.

Additionally, American fails to comprehend the intent of this exclusion. Ace must defend a claim that arises out of sexual abuse, but only if the allegation is proved to be false. In that case, the cost of the defense is limited to the amount prescribed under the professional liability coverage section. If the allegation is proved to be true, then neither the damages nor the cost of the defense will be covered by the policy. Clearly, exclusion J is intended to cover those instances in which the insured is falsely accused of sexual abuse. We have reviewed the remaining contentions and find them to be meritless. Accordingly, the trial court erred in finding that Ace owes a duty to defend Burnett in the underlying lawsuit.

## CONCLUSION

In sum, we conclude that American owes a duty to defend the claim against NSU for negligent hiring and Ace owes no duty to defend or indemnify the underlying claims against NSU or Burnett. For the

foregoing reasons, the decision of the circuit court of Lake County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

CALLUM, J., concurs.

JUSTICE O'MALLEY, specially concurring in part and dissenting in part:

I agree with the majority's conclusions that American owes a duty to defend the claim against NSU for negligent hiring and that Ace does not owe a duty to defend or indemnify Burnett. However, I must dissent from the majority's resolution that Ace owes no duty to defend NSU under Ace's supplemental professional liability coverage part.

In this case, NSU paid Ace for not only professional liability coverage but also supplemental liability coverage. When an insured pays an additional premium for supplemental liability insurance coverage, the law presumes that the insured intended to obtain broader liability coverage. See *International Surplus Lines Insurance Co. v. Pioneer Life Insurance Co. of Illinois*, 209 Ill. App. 3d 144, 149-50 (1990). During its review of whether there is potential coverage under the policy that triggers a duty to defend, the court should consider that the insured purchased the supplemental professional liability coverage to expand its professional liability coverage. See *Pekin Insurance*, 291 Ill. App. 3d at 895. The majority's reading of the supplemental liability coverage part not only ignores the policy's plain language but also renders any expanded liability coverage under that part illusory.

Contrary to the majority, I would hold that the "Supplemental Liability Coverage" part, at the very least, potentially grants coverage for the negligent hiring claim against NSU. In reaching this conclusion, I am guided by the rule of insurance contract interpretation that the entire document is to be examined to determine the parties' intentions with consideration given to the contract's subject matter and purpose as well as the policy's language. *Hannigan v. Country Mutual Insurance Co.*, 264 Ill. App. 3d 336, 339 (1994). I find it significant that Ace's policy consists of three "Coverage Part[s]": professional liability coverage, supplemental professional liability coverage, and personal injury coverage.

The Ace policy's "Professional Liability Coverage" is triggered only when an injury or damage is caused by a "medical incident arising out of professional services" by the insured. The "Supplemental Liability Coverage" covers an injury or damage that occurs in the course of NSU's professional services, but, unlike the "Professional

Liability Coverage" part, it does not require that the injury or damage stem from a medical incident.

The main difference between the supplemental and primary professional liability coverage parts is that the requirement that the injury or damage be caused by a "medical incident" is deleted from the supplemental coverage part. The Ace policy defines a "medical incident" as "any negligent act, error or omission in the rendering of or failure to render professional services that results in damages." This is a broad definition that encompasses any negligent acts or omissions arising from the insured's performance of or failure to perform its professional services. Thus, before coverage will be found under the primary professional liability coverage part, the complaint must allege negligent acts or omissions that satisfy the definition of a "medical incident."

The supplemental liability coverage part, however, requires that the *"injury* or *damage* must occur in the course of providing your professional services." (Emphasis added.) Therefore, if Enright's complaint alleges facts indicating that Jane Doe's injury occurred in the course of NSU's professional services, there is potential coverage under Ace's supplemental liability coverage part. I believe that Enright's complaint alleges such facts.

Enright states in her complaint that Jane Doe was injured while NSU's employee, Burnett, was performing ultrasound procedures on her. Because NSU's business was to furnish licensed ultrasound technicians to various health care facilities, Burnett's administration of the ultrasound procedures to Jane Doe was providing NSU's "professional services," as defined by the Ace policy (334 Ill. App. 3d at 1028).

The majority concludes that the professional services requirements of each section of the policy preclude coverage for NSU in the underlying action. I cannot agree. The majority focuses exclusively on NSU's allegedly negligent actions in hiring and training and whether these acts satisfy the Ace policy's definition of "professional services." However, coverage under the supplemental liability coverage part is not triggered by the negligent *acts* alleged in the complaint. Unlike the "Professional Liability Coverage" part, the supplemental liability coverage part provides coverage depending upon when (*i.e.,* "in the course of NSU's professional services") the alleged *injury or damage* occurred. This policy language is different from the language used in the cases cited by the majority that only consider whether a complaint's allegations were "due to" or "arise from" professional services, as opposed to whether the injury occurred "in the course of" the professional services. See *Pekin Insurance,* 291 Ill. App. 3d at 890-91 (construing whether a complaint's allegations were "due to" the

rendering or failure to render professional services and thus falling within the professional services exclusion of a "Businessowners Policy"); see also *Mork Clinic*, 575 N.W.2d at 603-04 (holding that "victim's injuries [from sexual abuse] were not a consequence of the delivery of professional services"); *Community Hospital*, 171 A.D.2d at 639, 567 N.Y.S.2d at 122-23 (negligent hiring claim did not "arise out of" rendering of professional services). I conclude that the damage alleged in Enright's complaint occurred in the course of the professional services of the ultrasound procedures administered by NSU's technician and, thus, is at least potentially covered by the plain language of the supplemental liability coverage part.

Ace's policy additionally states that the supplemental professional liability is "occurrence" coverage and defines an "occurrence" as an "accident *** which results in injury neither expected or intended by you." The policy does not define "accident." The "occurrence" definition in the Ace policy is similar to the American policy's "occurrence" definition, and I determine that the majority's reasoning that the Enright complaint sufficiently alleged an "occurrence" under American's policy results in the same outcome under Ace's policy. 334 Ill. App. 3d at 1030-34. Simply stated, "[t]here are no allegations in the underlying complaint that NSU intended to injure Jane Doe" (334 Ill. App. 3d at 1031); therefore, under Illinois law, Jane Doe's injury is considered an accident.

Although I find that Ace's supplemental professional liability policy potentially grants coverage for Enright's negligent hiring, investigation, and supervision claim, I also recognize that the "Supplemental Liability Coverage" part of the policy, like the "Professional Liability Coverage" part, specifically excludes "injury or damage caused by or resulting from non-professional services activities," which arguably might preclude coverage. However, immediately following this exclusion, the supplemental coverage part contains an exception to that exclusion. The exception states that the nonprofessional services exclusion does not apply to "activities which are ordinarily incidental to your professional services activities." Thus, coverage is intended for those activities that are not "professional services" as defined by the Ace policy but are "ordinarily incidental" to performing those services.

The majority's analysis of the meaning of "professional services" under the policy is fine. I have no quarrel with the cases cited and quoted by the majority in arriving at the definition of professional services, but those cases did not deal with a policy that has separate "Coverage Part[s]" entitled "Professional Liability Coverage" followed by "Supplemental Liability Coverage." See *Pekin Insurance*, 291 Ill. App. 3d at 890-91 (construing professional services exclusion

in "Businessowners Policy"). In addition, the foreign cases cited by the majority that found no coverage for negligent hiring as professional services contain no mention of coverage for activities ordinarily incidental to professional services. See *Mork Clinic*, 575 N.W.2d at 603-04 (determining that negligent hiring claim was not covered as a professional service by the clinic's professional liability policy); *Community Hospital*, 171 A.D.2d at 639, 567 N.Y.S.2d at 122-23 (under professional liability policy, negligent hiring was not a covered medical incident). Through its exception to the exclusion, the Ace policy's supplemental coverage part does not limit professional liability coverage only to injury or damage occurring in the course of providing the professional services but, rather, supplements it to include injury or damage caused by activities ordinarily incidental to professional services. Consequently, I find the majority's discussion of professional services insufficient without including an inquiry into whether NSU's administrative activities in hiring, investigating, and supervising its employees are activities that are ordinarily incidental to performing its professional services. That inquiry follows.

The Ace policy does not define what activities are ordinarily incidental to professional services. When words are not defined by an insurance policy, courts give them their plain and popular meaning. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 115 (1992). The word "ordinary" is defined as "usual; normal," and "incidental" means "something necessary, appertaining to, or depending upon another." Black's Law Dictionary 762, 1097 (6th ed. 1990). Applying these definitions shows that the hiring, investigating, and supervising of the employees who actually perform the professional services covered under this policy are clearly incidental and necessary to those professional services. Thus, I see the policy as unambiguously providing coverage.

At a minimum, that which I see as unambiguous is at least a *reasonable* interpretation of the policy. If an insurance policy's language is capable of more than one reasonable interpretation, then the interpretation that favors coverage prevails. *Outboard Marine Corp.*, 154 Ill. 2d at 119. In fact, if such activities are not incidental to providing ultrasounds, then I find it difficult to envision what activities would be considered incidental under the policy. Both Ace and the majority fail to identify any. If we cannot envision what would be considered incidental, then that language is ambiguous and needs to be construed against Ace. All doubts and uncertainties in an insurance policy's language must be construed strictly against the drafter and in favor of coverage. *Outboard Marine Corp.*, 154 Ill. 2d at 121. Consequently, I conclude that the facts alleged by Enright in the

underlying complaint are, at the very minimum, potentially within the policy's coverage.

In summary, NSU purchased not only professional liability coverage from Ace but also coverage that was supplemental to the professional liability coverage and expressly included coverage for activities ordinarily incidental to professional services. The supplemental coverage part was intended to expand NSU's professional liability coverage, as evidenced by the coverage part's title, the "Coverage Agreements" under Roman numeral I of the policy, and the fact that it covers an injury or damage not stemming from a medical incident. Given that this coverage part provides NSU supplemental and expanded liability coverage, I believe that the parties intended for the facts alleged in Enright's complaint to be covered and that Ace is required to defend NSU. Moreover, even if Ace did not intend to cover this risk, courts cannot rely on an insurer's intentions to defeat coverage for an insured. *Marshall v. Metropolitan Life Insurance Co.*, 337 Ill. App. 498, 509 (1949) ("[I]f the language of the insurance policy is susceptible to two interpretations, the question of intention is not germane, and that interpretation which will not defeat the insured's claim will be adopted"). If Ace had wanted to limit the definition of "ordinarily incidental" so that the term would not cover NSU's hiring and supervising activities, it could have done so. I would affirm the trial court's ruling that Ace owes a duty to defend NSU for the reasons expressly stated above and would then find it unnecessary to address the merits of the parties' other contentions concerning the Ace policy. On this basis, I dissent from the majority's determination that Ace does not owe a duty to defend NSU.