# Illinois Official Reports

## Appellate Court

> ### *Rosalind Franklin University of Medicine & Science v. Lexington Insurance Co.*,
> ### 2014 IL App (1st) 113755

| | |
|---|---|
| Appellate Court Caption | ROSALIND FRANKLIN UNIVERSITY OF MEDICINE AND SCIENCE, f/k/a Finch University/Chicago Medical School, Plaintiff-Appellee and Cross-Appellant, v. LEXINGTON INSURANCE COMPANY and LANDMARK AMERICAN INSURANCE COMPANY, Defendants-Appellants and Cross-Appellees (Lexington Insurance Company, Cross-Plaintiff-Appellant and Cross-Appellee; Landmark American Insurance Company, Cross-Plaintiff-Appellant and Cross-Appellee). |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-11-3755, 1-11-3756 cons. |
| Filed | March 7, 2014 |
| Rehearing denied | May 7, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the entry of summary judgment finding that two of plaintiff medical school's insurers had to indemnify plaintiff for the settlement of an underlying suit arising from plaintiff's decision to discontinue a study of a breast cancer vaccine, the appellate court affirmed the finding that the insurer of plaintiff's medical services had a duty to pay plaintiff's defense and settlement costs, and the judgment for plaintiff on its claim that its medical services insurer was estopped from asserting coverage defenses was upheld on the ground that plaintiff was represented by its own counsel throughout the proceedings and did not rely exclusively on the counsel appointed by the insurer in making decisions about the case; however, the entry of summary judgment for plaintiff on the count alleging that the second insurer was required to pay plaintiff's settlement costs in the underlying suit was reversed and the trial court was directed to enter summary judgment for the insurer on that count, and the trial court's rejection of plaintiff's claim of bad faith on the part of its first insurer was affirmed. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CH-14486; the Hon. Richard J. Billik, Jr., Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Matthew J. Fink, Paula M. Carstensen, Amy P. Klie, and Bridget M. Curry, all of Bates Carey Nicolaides LLP, of Chicago, for appellant Lexington Insurance Company.<br><br>Michael S. Knippen, James M. Eastham, and Natalie M. Limber, all of Traub Lieberman Straus & Shrewsberry, LLP, of Chicago, for appellant Landmark American Insurance Company.<br><br>Michael R. Gregg, Martin A. Kanofsky, and Danita L. Davis, all of Merlo Kanofsky & Gregg Ltd., of Chicago, for appellee. |
| Panel | JUSTICE TAYLOR delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice Palmer concurred in the judgment and opinion. |

**OPINION**

¶ 1    This appeal arises out of a declaratory judgment action involving an insurance dispute between plaintiff, Rosalind Franklin University of Medicine and Science (Rosalind), and two of its insurers, Lexington Insurance Company (Lexington) and Landmark American Insurance Company (Landmark).

¶ 2    Rosalind claimed coverage for a settlement it paid in an underlying lawsuit brought by former patients who sought compensation for Rosalind's decision to discontinue an experimental breast cancer vaccine program. As shall be discussed in greater detail below, Lexington's policies covered liability "resulting from a medical incident arising out of professional services," while Landmark's policy contained a specific exclusion for medical malpractice damages. When both insurers denied coverage, Rosalind brought the instant declaratory judgment action against them. Subsequently, Lexington filed a cross-claim against Landmark, contending that Landmark's policy should provide coverage for the underlying suit and settlement.

¶ 3    On November 23, 2011, the trial court granted summary judgment for Rosalind and against Lexington and Landmark, finding that both insurers had a duty to indemnify Rosalind for the settlement in the underlying suit. It is from this judgment that Lexington and Landmark now appeal. For the reasons that follow, we affirm in part and reverse in part.

¶ 4                                    I. BACKGROUND
¶ 5                                 A. The Underlying Lawsuit
¶ 6    The following facts regarding the underlying lawsuit are undisputed for purposes of this appeal. Rosalind is a not-for-profit medical school. Between 1989 and 2004, Rosalind administered a research study of a breast cancer vaccine developed by the late Dr. Georg Springer. The purpose of the study, entitled "Treatment of Carcinoma Patients with T/Tn Antigen," was to evaluate whether stimulating a person's immune system was effective in fighting breast cancer. Dr. Springer funded the study through a gift agreement that provided a donation of common stock valued at $2.5 million.

¶ 7    Each patient who participated in the Springer vaccine program executed a consent form that provided, in relevant part: "I understand that the purpose of this experimental research is to stimulate the immune system in an attempt to fight cancer. *** T/Tn antigen treatment will be continued *ad infinitum*." The consent form additionally stated: "[P]rocedures involved in this research are not part of my routine treatment and are not intended to potentially benefit my personal health. I am taking part in a study accumulating information on my body's response to T/Tn antigen vaccination."

¶ 8    In 2004, Rosalind's institutional review board (IRB) decided to discontinue the Springer vaccine program, citing the following reasons: (1) inadequate information from the program's principal investigator, (2) lack of scientific validity, (3) lack of demonstrable efficacy, and (4) inadequate assurance of safety.

¶ 9    Following this decision, in July 2004, approximately 50 of the former Springer vaccine patients filed suit against Rosalind, claiming that the decision to discontinue the vaccine program put their lives at risk. (We shall refer to this suit as "the *Pollack* suit" or "the underlying suit.") The *Pollack* complaint was prefaced with a preliminary statement alleging that the Springer vaccine treatments "have helped save and prolong the patients' lives," and, as a result, the termination of the vaccine program "has caused these patients to suffer incalculable damage." The preliminary statement additionally stated:

> "A cardinal principle of the medical profession is that, once care is undertaken, patients may not be abandoned. This litigation seeks relief for such abandonment of the plaintiffs who have been patients in the Springer/[Rosalind] anti-cancer vaccine program for many years. *** Each of [the claims in the complaint] arises as a direct and proximate result of [Rosalind's] improvident decision to terminate the life-saving treatments that have sustained these women for many years following their horrific experiences of breast cancer, surgery, radiation, chemotherapy, and other trauma."

¶ 10   The *Pollack* complaint alleged the following facts about Rosalind's decision to discontinue the Springer vaccine program. Starting in 1988, the Food and Drug Administration (FDA) cited the Springer vaccine program for multiple violations of proper laboratory management and research techniques. Instead of spending the necessary money to correct these deficiencies, Rosalind chose to end the program. To this end, its university

administrators allegedly "manipulate[d] the IRB to ensure the termination of the T/Tn anti-cancer vaccine program." The complaint acknowledged that the IRB cited lack of scientific validity as a reason for ending the program, but it stated that this justification was "a ruse" and contradicted "decades of evidence to the contrary." The complaint further alleged that the decision to end the program "significantly increases the likelihood that the patients will suffer a recurrence of cancer." In support, the complaint cited an alleged statement by Dr. Springer that "in order to maintain its effectiveness against any possible recurrence of cancer, the [vaccine] treatments must be continued throughout [the patient's] lifetime."

¶ 11        The *Pollack* plaintiffs sought injunctive relief as well as damages for breach of fiduciary duty, breach of contract, unjust enrichment, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2012)), common law fraud, and negligence. In the count for injunctive relief, the plaintiffs asked the court to require Rosalind to "disgorge all sums received from Dr. Springer" and release the available vaccines as well as all records pertinent to the program.

¶ 12        In the count for breach of fiduciary duty, plaintiffs claimed that a hospital/patient fiduciary relationship existed between the parties, which gave Rosalind the obligation "to comport with their professional responsibilities as articulated in the Code of Medical Ethics." Plaintiffs alleged that Rosalind violated the provision of the Code of Medical Ethics which states that a health care provider "may not discontinue treatment of a patient as long as further treatment is medically indicated, without giving the patient reasonable assistance and sufficient opportunity to make alternative arrangements for care." Plaintiffs further alleged that Rosalind breached its fiduciary duty by promising to continue the Springer vaccine treatments "*ad infinitum*" and then discontinuing them without any legitimate justification.

¶ 13        In the count for "Unjust Enrichment and Disgorgement," plaintiffs stated that during the course of the Springer vaccine program, Rosalind collected millions of dollars from Dr. Springer and thousands of dollars from the patients. Plaintiffs contended that Rosalind's retention of those funds after termination of the vaccine program constituted unjust enrichment and that such funds "should be disgorged from" Rosalind and placed in a fund to continue the vaccine program.

¶ 14        In the count for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, plaintiffs alleged that Rosalind knowingly deceived the patients by promising to continue the vaccine treatments "*ad infinitum*"; Rosalind intended for the patients to rely on its representations by entering the vaccine program and contributing sums of money; and the plaintiffs did, in fact, rely on such representations.

¶ 15        Finally, in the count for negligence, plaintiffs alleged that Rosalind had a duty to treat its patients with reasonable care, and it breached that duty by improperly managing the vaccine program and then terminating it with the knowledge that doing so would expose the patients to significant risk of injury. Plaintiffs stated, "As evidence of [Rosalind's] breach of its standard of care, [Rosalind] violated the Code of Medical Ethics." In support, they attached a healing arts affidavit from a health professional opining that there was a meritorious cause for the filing of the action.

¶ 16        On October 25, 2004, a hearing began on the *Pollack* plaintiffs' motion for a preliminary injunction to secure the funds that were gifted by Dr. Springer as well as the remaining vaccine. After the second day of the hearing, counsel for Rosalind determined that the case

was not proceeding well for Rosalind and that the possibility of a settlement should be explored. Consequently, the preliminary injunction hearing turned into a settlement conference.

¶ 17    On October 27, 2004, the parties reached a settlement in principle. Rosalind's president and board of trustees subsequently approved the settlement, and the final agreement was executed on December 4, 2004. The agreement provided for payments by the university of: (1) $2.5 million to be placed in a trust for the plaintiffs to resume the vaccine study; (2) $1 million if the plaintiffs successfully resumed the study; and (3) $500,000 "to compensate the plaintiffs for pain and suffering." The underlying plaintiffs did not succeed in restarting the vaccine program and, therefore, Rosalind's total settlement payment was $3 million.

¶ 18                              B. The Insurance Policies

¶ 19    At all times relevant to this lawsuit, Lexington had issued primary and excess healthcare liability policies to Rosalind, while Landmark had issued a directors and officers liability policy to Rosalind.

¶ 20    The primary policy issued by Lexington is a "Healthcare Professional Services Liability Policy" (hereinafter, the Lexington Primary Policy), which contains a limit of $1 million per "medical incident," subject to a $100,000 self-insured retention. The policy covers sums that Rosalind becomes legally obligated to pay as damages "resulting from a medical incident arising out of professional services." The phrase "medical incident" is defined as "any act, error or omission in the providing of or failing to provide professional services." The phrase "professional services" is defined as follows:

> "1. Medical, surgical, dental, nursing or other health care services including but not limited to the furnishing of food or beverages in connection with such services; the practice of nuclear medicine; the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances; or the handling or treatment of deceased human bodies, including but not limited to, autopsies, organ donation or other procedures."

The Lexington Primary Policy additionally contains a voluntary payment provision which provides that without Lexington's consent, the insured shall not "except at [its] own cost, voluntarily make a payment, assume any obligation, or incur any expense."

¶ 21    Lexington also issued an "Excess Healthcare Professional Liability Policy" (hereinafter, the Lexington Excess Policy) to Rosalind for the same policy period. This policy has a limit of $2 million for "each medical incident" and otherwise contains the same relevant coverage provisions as the Lexington Primary Policy.

¶ 22    The other defendant, Landmark, issued a "Directors and Officers Liability Policy" (hereinafter, the Landmark Policy) to Rosalind with an aggregate limit of $5 million per policy period. The parties do not dispute that Landmark owed no defense obligation with regard to the underlying suit. Thus, the only issue presented in this case with regard to Landmark is whether the Landmark Policy provides indemnity to Rosalind for the settlement paid to the underlying plaintiffs.

¶ 23    Under the Landmark Policy, Landmark agrees to provide coverage to Rosalind for any covered "Loss" that Rosalind became legally obligated to pay as a result of a "Claim" for a "Wrongful Act." The term "Loss" is defined as follows, in relevant part:

"[D]amages, settlements, judgments and Defense Expenses, including punitive or exemplary damages, if insurable under the law pursuant to which this policy is construed ***. Loss, however, shall not include:

> ***
>
> ii. matters which are uninsurable under the law pursuant to which this policy shall be construed;
>
> ***
>
> iv. any amount which an Insured Person is obligated to pay as a result of a Claim seeking relief or redress in any form other than money damages ***."

The term "Wrongful Act" is defined as "any actual or alleged error, omission, misstatement, misleading statement, neglect or breach of duty by an Insured Person solely in their capacity as an Insured Person acting on behalf of the Insured Organization."

¶ 24　　　The Landmark Policy also contains two exclusions relevant to this appeal. First, it contains a "Medical Malpractice Exclusion (With Management Carveout)," which states, in relevant part:

> "In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured Person and/or the Insured Organization based upon or attributable to any medical or professional malpractice including but not limited to the rendering or failure to render any medical or professional service(s)."

¶ 25　　　Second, the Landmark Policy contains an exclusion for bodily injury, including pain and suffering, as follows: "The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against the Insured Persons: *** (1) for any actual or alleged (a) bodily injury, sickness, disease, or death of any person, mental anguish, or emotional distress ***."

¶ 26　　　　　　　　　　　　　　C. The Coverage Dispute

¶ 27　　　On July 20, 2006, Rosalind filed the instant action against Lexington and Landmark.[1] In its complaint, Rosalind alleged that immediately after the underlying plaintiffs filed the *Pollack* suit in July 2004, Rosalind notified Lexington and Landmark of the suit. On August 13, 2004, Landmark denied coverage to Rosalind under the Landmark Policy. Lexington, however, did not provide written notice to Rosalind that it was or was not providing Rosalind a defense through the Lexington Primary Policy. Rosalind proceeded with the underlying case, represented by attorney Robert Vogt, and eventually reached a settlement agreement with the *Pollack* plaintiffs. (Additional facts regarding Vogt's representation of Rosalind during the *Pollack* suit shall be set forth below as part of the discussion on whether Lexington breached its defense obligations.) Subsequently, Lexington sent a letter to Rosalind denying coverage to Rosalind for its defense and indemnity costs, including the settlement to the underlying plaintiffs.

---

[1]The complaint also contained counts against Robert Vogt, who represented Rosalind in the *Pollack* suit, and Vogt's law firm, Weldon-Linne & Vogt. However, these counts were later voluntarily dismissed and are not at issue in the instant appeal.

¶ 28    Rosalind sought relief against Lexington and Landmark in nine counts, the first six of which were against Lexington. In counts I and VI, Rosalind sought a declaratory judgment that the Lexington Primary Policy and Lexington Excess Policy, respectively, were obligated to pay for its defense and settlement costs in the underlying suit.

¶ 29    Counts II through IV concerned estoppel and waiver. In count II, Rosalind argued that Lexington was estopped from raising any coverage defenses because it failed to either defend Rosalind under a reservation of rights or file a declaratory judgment action to determine the rights of the parties. In count III, Rosalind argued in the alternative that Lexington was estopped from raising coverage defenses because it undertook Rosalind's defense while failing to disclose coverage issues that would present a conflict of interest under *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187 (1976). In count IV, Rosalind alleged that Lexington appointed Vogt to defend Rosalind in the *Pollack* suit in July 2004 but did not attempt to reserve its rights to deny coverage until after Rosalind and Vogt had engaged in settlement negotiations with the underlying plaintiffs. Thus, Rosalind contended, Lexington waived its rights to deny insurance coverage for the underlying suit.

¶ 30    Additionally, in count V, "Bad Faith," Rosalind contended that Lexington acted in a "vexatious and unreasonable" manner and that Rosalind was therefore entitled to attorney fees and a statutory fine.

¶ 31    With regard to Landmark, in count VII, Rosalind sought a declaratory judgment that the Landmark Policy was obligated to pay for its settlement costs in the underlying suit. Finally, in counts VIII and IX, Rosalind sought damages for breach of contract against Lexington and Landmark, respectively.

¶ 32    Lexington subsequently filed a cross-complaint against Landmark, seeking a declaration that Landmark was obligated to indemnify Rosalind for the entire *Pollack* settlement.

¶ 33    The parties filed cross-motions for summary judgment, which the trial court ruled upon on March 10, 2009. The trial court granted partial summary judgment for Rosalind and against Lexington on counts I and III of Rosalind's complaint. That is, it found that Lexington had a duty to defend and indemnify Rosalind and was estopped from asserting coverage defenses due to a *Peppers* conflict of interest. The trial court additionally granted partial summary judgment for Landmark with respect to the $500,000 of the underlying settlement that was "to compensate the plaintiffs for pain and suffering," finding that it came within the bodily injury exclusion of the Landmark Policy.

¶ 34    On April 1, 2009, Rosalind moved for the entry of a monetary judgment against Lexington based on the trial court's summary judgment ruling. On November 24, 2009, the trial court granted partial judgment against Lexington in the amount of $1 million (the amount of the Lexington Primary Policy), minus the $100,000 self-insured retention, plus interest and defense costs. However, the court found that Rosalind had failed to show that Lexington's breach of the duty to defend implicated the Lexington Excess Policy.

¶ 35    Lexington subsequently filed a motion for reconsideration of the trial court's March 10, 2009, and November 24, 2009, orders. In that motion, Lexington contended that new evidence showed that (1) Rosalind did not surrender control of the *Pollack* suit to Lexington, and (2) Rosalind had been advised that the suit presented coverage issues and chose to commit to the settlement anyway. The trial court denied Lexington's motion for reconsideration.

¶ 36    Meanwhile, the parties again filed cross-motions for summary judgment. On May 26, 2011, the trial court granted summary judgment to Rosalind on its claims for indemnification under the Lexington Excess Policy and the Landmark Policy but declined to find for Rosalind on its claim of bad faith against Lexington. The trial court additionally denied summary judgment to Lexington on its cross-claim against Landmark, declining to find that Landmark had the sole duty to indemnify Rosalind for the underlying settlement.

¶ 37    Based upon these rulings, Rosalind again moved for the entry of a monetary judgment against the defendants. On November 23, 2011, the trial court found that the Landmark Policy was primary to the Lexington Excess Policy, such that the Landmark Policy needed to be exhausted before Lexington's excess policy could be triggered. Thus, the court allocated the remaining $2 million of the underlying settlement to the Landmark Policy, minus a setoff for Landmark's $100,000 self-insured retention. The trial court also awarded prejudgment interest to Rosalind at five percent per annum since the date that the *Pollack* suit was filed.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, both Lexington and Landmark contend that the trial court erred in granting summary judgment for Rosalind. Lexington additionally contends, with regard to its cross-claim, that the trial court erred in declining to hold Landmark solely responsible for indemnifying Rosalind. Landmark, meanwhile, appeals the order of the trial court awarding prejudgment interest to Rosalind.

¶ 40    Additionally, Rosalind asserts cross-appeals against both Lexington and Landmark. With regard to Lexington, Rosalind contends that the trial court erred in finding that Lexington's conduct did not amount to bad faith. With regard to Landmark, Rosalind contends that the trial court erred in finding that it was required to pay a second self-insured retention for the *Pollack* suit.

¶ 41    We shall consider the issues related to this multiplicity of appeals as follows. First, we consider whether the trial court was correct in finding that Lexington was estopped from raising coverage defenses under the Lexington Primary Policy because of its actions with respect to the defense of Rosalind in the underlying suit. Second, we consider the substantive coverage issues in this case. Finally, we consider the remaining issues raised in this appeal, namely, Landmark's contention that the trial court erred in awarding prejudgment interest to Rosalind, as well as Rosalind's two cross-appeals. We review the trial court's entry of summary judgment *de novo*. *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284 (2002); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

¶ 42                A. Whether Lexington Is Estopped From Raising Coverage Defenses

¶ 43    Rosalind contends, as it did before the trial court, that Lexington is estopped from asserting coverage defenses under the Lexington Primary Policy because it undertook Rosalind's defense for several months before failing to disclose coverage issues, thereby prejudicing Rosalind. Lexington, on the other hand, contends that no prejudice occurred where Rosalind retained control of its own defense throughout.

¶ 44    Under Illinois law, an insurer is estopped from asserting coverage defenses if it undertakes the defense of its insured, inducing the insured to surrender control of its defense and thereby causing prejudice to the insured. *Peppers*, 64 Ill. 2d at 195; *Western Casualty &*

*Surety Co. v. Brochu*, 122 Ill. App. 3d 125, 134 (1984) (discussing *Peppers*). The insured has the burden of establishing prejudice by " 'clear, concise, and unequivocal evidence' " (*Brochu*, 122 Ill. App. 3d at 134 (quoting *Royal Globe Insurance Co. v. Tutt*, 108 Ill. App. 3d 69, 72 (1982))), and prejudice will not be presumed from an insurer's mere entry of appearance and assumption of the defense. *Tutt*, 108 Ill. App. 3d at 72 (trial court erred in applying a conclusive assumption of prejudice based upon the fact that the insurer's appointed counsel appeared for the insured).

¶ 45        The two leading cases in Illinois on this issue are *Gibraltar Insurance Co. v. Varkalis*, 46 Ill. 2d 481 (1970), and *Peppers*, 64 Ill. 2d 187. In *Varkalis*, a wrongful death action was filed against the insured. *Varkalis*, 46 Ill. 2d at 483. In March 1964, the insurer filed an appearance and an answer on behalf of the insured. *Id.* at 483-84. However, it was not until July 1965 that the insurer advised the insured that it was defending the action under a reservation of rights. *Id.* at 484. Under these facts, the *Varkalis* court held that the insurer was estopped from denying liability under its policy. *Id.* at 486-87. The court reasoned that the insurer was aware of the possible existence of the policy defense at the time it assumed the representation of its insured, since it had enough information to file an answer to the underlying complaint. *Id.* at 487-88. Nevertheless, the insurer "acted on behalf of [the insured] as though no questions of policy coverage were involved, thus clearly causing him to wholly rely for his defense on the efforts of [the insurer]." *Id.* at 488.

¶ 46        By contrast, in *Peppers*, the court found no prejudice to the insured when the insurer withdrew after representing the insured after 24 days. *Peppers*, 64 Ill. 2d at 196. In that case, a personal injury suit was filed against the insured. *Id.* at 194. The insured was initially represented by his own attorney, and, in fact, that attorney never withdrew his appearance. *Id.* at 194-95. Ten months after the filing of the complaint, counsel appointed by the insurer filed an appearance and an answer in the suit. *Id.* at 195. However, 24 days later, the insurer's counsel withdrew both their answer and their appearance, thus apparently leaving the insured's own attorney to continue litigating the case. *Id.* The *Peppers* court found that no estoppel would result from such actions, since the insured was represented by his own attorney at all times and there was no indication in the record that he surrendered the right to conduct his own defense. *Id.* at 196; see also *American States Insurance Co. v. National Cycle, Inc.*, 260 Ill. App. 3d 299, 309-10 (1994) (no estoppel under *Peppers* where the insured's personal attorney continued to actively represent it even after the insurer's counsel appeared on its behalf); *Mid-State Savings & Loan Ass'n v. Illinois Insurance Exchange, Inc.*, 175 Ill. App. 3d 265, 271-72 (1988) (no estoppel under *Peppers* where insurer waited six months to reserve its rights, but there was no evidence that the insureds lost the ability to assert any defense or that private counsel would have conducted the defense differently). Thus, under *Peppers* and *Varkalis*, a key factor to consider in the estoppel analysis is the extent to which the insured relied on the insurer for his defense, as opposed to relying on his own private counsel.

¶ 47        In the present case, Lexington argues that it should not be estopped from raising coverage defenses for two reasons. First, Lexington argues that it did not undertake the defense of Rosalind, insofar as attorney Robert Vogt, who represented Rosalind in the *Pollack* suit, was not appointed by Lexington. Second, it argues that even if Vogt was appointed by Lexington, the record shows that Rosalind did not surrender control of its defense but, rather, maintained

control through the involvement of attorney Patricia Bergeson, Rosalind's general counsel. We disagree with Lexington on the first point but agree on the second.

¶ 48    Initially, Rosalind contends that Lexington admitted that it appointed Vogt in its response to Rosalind's second request to admit. We disagree. Lexington's response only states, in various iterations, that Lexington did not give Rosalind written notice that it had appointed Vogt; it gives no clear statement as to whether or not Lexington actually appointed him.

¶ 49    Nevertheless, the deposition testimony of Vogt and Bergeson shows that Lexington was, in fact, the party who appointed Vogt. In his deposition, Vogt testified that prior to his involvement in the *Pollack* suit, he had worked on 10 to 15 cases for Rosalind, and all but one of those cases were covered by AIG. (AIG is a family of insurance companies that includes Lexington.) With regard to the *Pollack* suit in particular, he stated, "It is my understanding that both Rosalind Franklin and AIG were involved or at least consented–however you want to put it–acquiesced to my involvement in the case." Counsel for Rosalind asked Vogt about who asked him to work for Rosalind in that action. Vogt stated that he initially received a copy of the *Pollack* complaint from Gardner, Carton & Douglas, a law firm that was at the time working for Rosalind. Vogt forwarded the complaint to Satish Bonthala, Lexington's claims representative, and they discussed it. Based upon their discussion, Vogt understood that he was being assigned to defend Rosalind like he had done in previous cases. Accordingly, Vogt contacted Bergeson, and they began working on the defense of the case together. He explained: "So did Bonthala say I'm going to–I want you to start working on this case, yes. Did Bergeson also agree with that, yes. *** This was a dual thing. Both people were on board."

¶ 50    Bergeson's deposition testimony tells a somewhat different story, but it is consistent with Vogt's testimony with regard to Lexington's involvement. Bergeson testified that around the time of Vogt's entry into the case, she received a heads-up from Cindy Higby of Rosalind that Lexington had appointed counsel, and Vogt later confirmed to Bergeson that he had been appointed by Lexington. Based upon this testimony, we find that the trial court did not err in finding that Lexington appointed Vogt to defend Rosalind in the *Pollack* action.

¶ 51    Notwithstanding the foregoing, Lexington argues that Rosalind was not prejudiced by Vogt's appointment where Rosalind did not surrender control of the case to him. See *Tutt*, 108 Ill. App. 3d at 72 (prejudice will not be presumed from an insurer's mere entry of appearance and assumption of the defense). Rosalind, on the other hand, argues that Vogt controlled the defense and, in particular, was the driving force behind the negotiations that culminated in the settlement agreement for which Lexington now refuses to pay.

¶ 52    In support of their respective positions, the parties cite the deposition testimony of Vogt, Bergeson, and Dr. Welch, Rosalind's president and chief executive officer (CEO). In particular, Lexington argues that Vogt's testimony demonstrates that Rosalind remained in control of the *Pollack* defense, while Rosalind argues that the opposite conclusion can be drawn from the testimony of Bergeson and Dr. Welch.

¶ 53    Because this is a fact-specific inquiry, we shall set forth the relevant deposition testimony in detail. In his deposition, Vogt testified that during his work on the *Pollack* suit, he spoke with Bergeson frequently, because she knew about the factual situation and the inner workings of the IRB. He stated that Bergeson was highly involved in the defense strategy. "She was helping to control and direct how we were going to win the case," he said. "She was a key player." When asked whether he would have pursued a strategic option if

- 10 -

Bergeson disagreed with it, Vogt stated that such a situation never arose, because Bergeson was so knowledgeable regarding the witnesses and doctors involved.

¶ 54    Vogt also testified extensively regarding Bergeson's role in shaping the settlement that was eventually reached with the *Pollack* plaintiffs. As noted, the preliminary injunction hearing began on Monday, October 25, 2004. Vogt testified: "My orders were clear on Monday and Tuesday that we were going to defend the case. Science supported our position and that was it. I had no instructions to the contrary until Tuesday evening." On that evening, according to Vogt, "Patricia Bergeson called me and told me that the media reports are too bad. The publicity is too bad. We're going to settle the case tomorrow. I said okay, how do you want to do this? And we started talking back and forth about what to do." Together, Vogt and Bergeson came up with the idea of restarting the vaccine program at a different institution. The two of them worked to draft an initial settlement proposal based upon that idea. Vogt testified that Bergeson "went through step-by-step-by-step with what we would do," and after Vogt had finished writing up the settlement proposal, Bergeson reviewed it. He explained, "[Bergeson] was the expert on the IRB, I was not. *** [T]he bottom line is that I turned to her for her expertise on those areas."

¶ 55    The following morning, Vogt testified that he sent a letter to Bonthala, Lexington's claims representative, regarding the settlement proposal. That letter stated, "The program set forth above will not at this time involve any contribution from AIG." Counsel for Rosalind asked Vogt why he included that sentence in the letter. Vogt answered that it was pursuant to the plan that he and Bergeson had put together the night before. He stated that Bergeson read and reviewed the letter to Bonthala before he sent it.

¶ 56    In any event, Vogt testified that the *Pollack* plaintiffs rejected his initial settlement proposal because they wanted monetary damages. He stated that they initially demanded $4 million, but Bergeson convinced them to drop to $3 million plus an additional $1 million if they successfully resumed the study. "I was very impressed with that," he said. "She saved a university a million dollars contingent on that." Counsel for Rosalind asked him whether, after the settlement agreement was reached, he offered an opinion to Bergeson on whether or not it was reasonable. Vogt said:

> "No way. No. I did not know what pressure she was under. *** She said 'Publicity is too bad. We've got to settle the case tomorrow.' She knows these things. I do not. I had no way to assess how urgent it was for her to settle the case. It was her decision."

¶ 57    Meanwhile, in her deposition, Bergeson testified that Vogt, as counsel appointed by Lexington, "was taking a substantive role in the litigation." Prior to the preliminary injunction hearing, she discussed strategy with Vogt, and Vogt laid out his plans on how best to present the defense.

¶ 58    Regarding the preliminary injunction hearing, Bergeson testified that she attended part of the hearing and had the overall impression that it was not going well. However, she stated that she did not recall calling Vogt to tell him that the case needed to be settled because of bad publicity. "[Y]ou never settle a case simply on the basis of bad publicity, in my experience," she said. She further stated that the account of events that Vogt gave in his deposition was inaccurate, insofar as it portrayed the decision to settle as being the result of just one thing. On the contrary, Bergeson stated that they had been trying to settle the case since July, and there was "ongoing dialogue" between her and Vogt on the issue of settlement.

¶ 59 Eventually, the hearing turned into a settlement conference. Bergeson stated that she could not recall exactly how the settlement negotiations arose, but she did remember the judge being of the firm opinion that settlement should be pursued. During those negotiations, according to Bergeson, Vogt was the official voice for the university, although Bergeson was also present for part of the proceedings.

¶ 60 Finally, in his deposition, Dr. Welch testified that he trusted Bergeson to keep him apprised of any significant developments in the *Pollack* case, and he relied upon her legal expertise. He first heard of Vogt when Bergeson informed him that "the insurance company had insisted that he be on the defense team." He stated that Vogt became Rosalind's sole attorney "other than general counsel who was, of course, representing the university, but not directly involved."

¶ 61 Dr. Welch stated that "Ms. Bergeson had always advised me that it would be important to settle the case" because of possible liability for medical malpractice. However, he never gave Vogt the authority to settle the case, nor did he advise Bergeson that she could extend such authority to Vogt. When the parties reached their initial agreement on October 27, 2004, Bergeson called Dr. Welch to inform him of the settlement. Dr. Welch stated that he assumed that Vogt was the "driving force" behind the settlement terms based on "the fact that he was our defense attorney and that he was hired by the insurance company."

¶ 62 Based upon this evidence, we find that Rosalind did not surrender control of its defense to Lexington, so as to trigger estoppel under *Peppers* and *Varkalis*. Although Vogt played "a substantive role in the litigation" (to use Bergeson's words), it is apparent that Bergeson played a substantive role as well. She frequently spoke with Vogt regarding the *Pollack* case, and they discussed strategy together. It was Vogt's uncontroverted testimony that Bergeson helped "to control and direct" the defense because of her superior knowledge of the factual situation and the IRB. Dr. Welch relied on Bergeson, not on Vogt, to keep him apprised of developments in the case. With regard to the settlement in particular, although Vogt and Bergeson have different versions of events, both of them have Bergeson playing a significant part. Vogt stated that "[i]t was her decision" to settle and that Bergeson was the one who negotiated the final $3 million deal. Bergeson denied ordering Vogt to settle because of bad publicity, but she said that she was engaged in "ongoing dialogue" with him about settlement, and she attended much of the settlement negotiations. Although Dr. Welch stated a belief that Vogt was the "driving force" behind the settlement terms, this carries minimal weight, since his belief was based upon his assumptions about Vogt's role as defense counsel rather than any personal knowledge.

¶ 63 Due to Bergeson's active role in the litigation, the instant case is analogous to *National Cycle*, 260 Ill. App. 3d at 307-10, where the court rejected a similar estoppel claim. In that case, the insured, National Cycle, was sued by one of its customers. *Id.* at 301. National Cycle retained an attorney and proceeded to defend itself. *Id.* Subsequently, the underlying plaintiff voluntarily dismissed his complaint and, one week later, refiled it. *Id.* at 302. At this time, National Cycle tendered the defense of the action to its insurer, and its insurer appointed defense counsel. *Id.* However, National Cycle's personal attorney continued to represent it alongside the insurer's counsel. *Id.* at 309. Three months later, the insurer sent a reservation of rights letter to National Cycle. *Id.* at 302. Upon these facts, the court found that "it is clear that National Cycle did not rely exclusively upon counsel hired by [the insurer] for its defense during the three months between the appearance and the reservation of rights." *Id.*

at 310. Accordingly, the court held that the insurer was not estopped from raising defenses under its policy. *Id.*

¶ 64　　Likewise, in the instant case, it is apparent that Rosalind did not rely exclusively upon Vogt, since even after Vogt's appointment, Bergeson continued to play an active role in the defense. See *Peppers*, 64 Ill. 2d at 196 (no estoppel where the insured was represented by his own attorney at all times and there was no indication in the record that he surrendered the right to conduct his own defense). Moreover, Rosalind has not established that Vogt's representation was defective or that counsel for Rosalind would have conducted the defense any differently in his absence. See *Mid-State*, 175 Ill. App. 3d at 271 (insureds failed to show prejudice where there was no indication that private counsel would have conducted the defense differently). We therefore find that the trial court erred in granting summary judgment to Rosalind on its estoppel claim against Lexington.

¶ 65　　　　　　　　　　　　　　　　B. Coverage Issues

¶ 66　　We therefore turn to the major issue in the case, namely, whether Lexington's and Landmark's policies provided coverage for the defense and indemnity of the underlying suit. (As noted, the parties agree that Landmark owed no defense obligation, but its duty to indemnify is still at issue.) Defendants' contentions on this issue can be summed up as follows. First, Lexington and Landmark contend that the settlement represented a disgorgement of funds that Rosalind had no legal right to retain, which does not constitute "damages" or a "loss" under their respective policies. Second, Lexington and Landmark disagree as to whether the primary focus of the underlying suit was medical in nature. Lexington contends that the underlying suit did not seek damages "resulting from a medical incident arising out of professional services," as would bring it within the ambit of Lexington's policies. Conversely, Landmark contends that the underlying suit involved a failure to render medical services and therefore falls within the medical malpractice exclusion in the Landmark Policy. Third, Lexington contends that the trial court erred in finding that the Landmark Policy did not cover the $500,000 purportedly paid to the plaintiffs "for pain and suffering," since subsequent testimony by Vogt showed that the amount was actually intended as attorney fees. Fourth, Lexington contends that Rosalind's failure to obtain consent for the underlying settlement precludes any duty to indemnify on its part. Fifth, Lexington contends that it had no duty to defend because Rosalind failed to inform it of the exhaustion of the $100,000 self-insured retention contained in the Lexington Primary Policy.

¶ 67　　In considering these contentions, we are mindful that when construing an insurance policy, the court must ascertain and give effect to the intention of the parties as expressed in the policy language. *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005). If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning. *Outboard Marine Corp.*, 154 Ill. 2d at 108. However, if the words are susceptible to more than one reasonable interpretation, all doubts and ambiguities will be resolved in favor of the insured. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 74 (1991).

¶ 68                    1. Whether the Settlement Constitutes an Uncovered Disgorgement

¶ 69        As previously noted, the Springer vaccine program was funded with money donated by the late Dr. Springer (hereinafter, the Springer funds). Defendants allege that the Springer funds were earmarked solely for use in connection with the Springer vaccine program, such that when Rosalind discontinued the program, it forfeited all right to those funds. Thus, according to the defendants, Rosalind's subsequent settlement with the underlying plaintiffs was merely a disgorgement of wrongfully retained funds, not "damages" or a "Loss" as defined in their respective policies. In response, Rosalind alleges that the Springer funds were actually earmarked for cancer research generally and are still being held for that purpose, as evidenced by the fact that the settlement paid to the underlying plaintiffs did not come from the Springer funds but from general operating funds. Rosalind further argues that the settlement did not constitute a turnover of funds but, rather, damages for Rosalind's alleged breaches of duties, fraud, and misrepresentation, which cannot be construed as disgorgement. We agree with Rosalind.

¶ 70        Defendants cite *Local 705 v. Five Star Managers, L.L.C.*, 316 Ill. App. 3d 391 (2000), for the proposition that under Illinois law, disgorgement does not constitute an insurable loss. In *Local 705*, the plaintiff union sought coverage for an underlying settlement that it paid to a sister pension fund. *Id.* This settlement represented repayment of funds that the union had allegedly taken from the pension fund in violation of fiduciary duties imposed under federal law. *Id.* at 392. After reaching this settlement, the union brought a declaratory judgment action seeking coverage for the amount of the settlement under its fiduciary liability insurance policy. *Id.* The *Local 705* court ruled that no coverage was afforded because the union sustained no insurable "loss" where it simply returned the pension fund's monies. *Id.* at 394. The court noted that the term "loss" was defined as a deprivation, and it further stated:

            "Here, there is no question that the sole basis upon which [the union] paid out the settlement amount was the Pension Fund's claim that [the union] was required to return those monies which it had no right to possess in the first place. Such a payment can hardly be termed a loss. Nor can such payment create a deprivation any more so than any borrower can be said to suffer a deprivation from being required to repay an indebtedness." *Id.* at 395.

        See also *Nortex Oil & Gas Corp. v. Harbor Insurance Co.*, 456 S.W.2d 489, 494 (Tex. Civ. App. 1970) ("[a]n insured *** does not sustain a covered loss by restoring to its rightful owners that which the insured, having no right thereto, has inadvertently acquired").

¶ 71        Rosalind does not contest the general proposition that there is no insurable loss where an insured is compelled to turn over money that it never had the right to possess. Instead, Rosalind argues that it retained the right to the Springer funds throughout the course of the underlying litigation, such that the underlying settlement in this case was not a disgorgement and *Local 705* does not operate to bar indemnification under defendants' policies.

¶ 72        In support, Rosalind cites the trust agreement signed by Dr. Springer on August 17, 1989, in which he gives the Springer funds to Rosalind. In that agreement, Dr. Springer does not restrict the use of those funds to the Springer vaccine program but states that they are to be used for cancer research generally. The relevant portion of the agreement is as follows:

            "The Gift is made and accepted upon the specific understanding that it be used to establish a permanent fund (the 'Fund') for cancer research (which term includes patient treatment necessary to test and validate or invalidate the results of basic

- 14 -

research only) in the name and under the auspices of the Heather Margaret Bligh Cancer Research Biology Laboratory (the 'Bligh Laboratory') to be established and maintained by the School. The Fund will be administered by the School and the income and principal used to support cancer research through the Bligh Laboratory in such manner as the School deems best suited to the cure and eradication of cancer ***."

This agreement is consistent with a letter that Dr. Springer sent to Dr. Herman Finch, Rosalind's chairman of the board of trustees, on March 6, 1989. In that letter, Dr. Springer states that the Bligh Laboratory's cancer research will be conducted "with the approval and in accordance with the rules of the Research Committee–Institutional Review Board." This statement reflects an understanding that Rosalind's IRB would have the power to oversee and possibly even discontinue any treatment of patients that was being funded with Dr. Springer's gift.

¶ 73    Thus, contrary to defendants' contention, it is apparent from the record that Rosalind did not forfeit its right to the Springer funds upon termination of the Springer vaccine program, as long as it continued to use the funds in cancer research pursuant to the terms of the trust agreement signed by Dr. Springer.

¶ 74    Defendants nevertheless argue that the plain language of the trust agreement is superseded by the fact that both the underlying plaintiffs and Dr. Springer's children believed that the Springer funds were only to be used in conjunction with the Springer vaccine program. Defendants cite the preliminary injunction motion filed by the underlying plaintiffs, which alleges that the Springer funds were "specifically earmarked" for the continuation of that program. The underlying plaintiffs supported their motion with affidavits from three of Dr. Springer's children (Julia Springer Tolkan, Dr. Elizabeth Springer, and Dr. Martin Springer), all of whom aver that Dr. Springer "stated on more than one occasion that the millions he gave to [Rosalind] were specifically earmarked for and dedicated to his anti-breast cancer T/Tn vaccine program." However, these allegations are not dispositive in light of the trust agreement signed by Dr. Springer, which does not purport to limit the use of the Springer funds to the Springer vaccine program but only states that they shall be used for "cancer research" generally.

¶ 75    Defendants next point out that according to the 2004 deposition testimony of Rosalind's president and CEO, the Springer funds had not, in fact, been used for any purpose except to support the Springer vaccine study. Yet the fact that Rosalind did not use the funds for other cancer research does not *ipso facto* mean that Rosalind was barred from using them for other cancer research. In a similar vein, defendants' observation that Rosalind maintained the Springer funds separately from other funds is entirely consistent with the language of the Springer trust agreement stating that the funds were to be held for purposes of cancer research.

¶ 76    Finally, defendants argue that the underlying plaintiffs sought and ultimately received "disgorgement" of the Springer funds via their settlement agreement with Rosalind. In support, defendants cite the fact that the underlying complaint contained a count for "Unjust Enrichment and Disgorgement." They also cite the underlying plaintiffs' motion for preliminary injunction, which states that the plaintiffs have "clearly and consistently demanded from [Rosalind] one thing: the turnover of the vaccine as well as the funds Dr. Springer dedicated to the treatment program." However, the underlying complaint also

sought damages for breach of duties, fraud, and misrepresentation, which cannot be framed as disgorgement or a turnover of funds. The settlement agreement disposed of all of the underlying plaintiffs' claims, including the nondisgorgement claims. Therefore, it is apparent that the settlement did not represent a disgorgement of the Springer funds. This is further supported by the fact, as attested to by Rosalind's president and CEO, that Rosalind paid the underlying settlement out of its general operating account rather than out of the Springer funds.

¶ 77    Thus, for the foregoing reasons, we find that the trial court was correct in finding that Rosalind's payment of the underlying settlement did not constitute a disgorgement under *Local 705*.

¶ 78              2. Whether the Underlying Allegations Constitute Medical Malpractice

¶ 79    The next point of contention among the parties is whether the allegations of the underlying suit can be considered allegations of medical malpractice. As noted, Lexington's policies cover damages "resulting from a medical incident arising out of professional services." Unsurprisingly, Lexington argues that the primary focus of the underlying suit and settlement was not professional services but, rather, wrongful administrative acts. The Landmark Policy, on the other hand, contains an exclusion for medical malpractice, which includes "rendering or failure to render any medical or professional service(s)." Landmark therefore argues the opposite. Rosalind, meanwhile, argues that both professional services and administrative acts received "equal primary focus" in the underlying suit, so as to render the $2.5 million portion of the settlement covered by both Lexington and Landmark.

¶ 80    In considering these contentions, we are mindful that an insurer's duty to defend is much broader than its duty to indemnify. *Outboard Marine*, 154 Ill. 2d at 125. If the underlying complaint alleges facts that are within or even potentially within the scope of the coverage, then the insurer has a duty to defend. *Id.* (citing *Wilkin*, 144 Ill. 2d at 73 ("An insurer may not justifiably refuse to defend an action against its insured unless it is *clear* from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." (Emphasis in original.))); *Peppers*, 64 Ill. 2d at 194. This duty to defend extends to cases where the underlying complaint alleges several causes of action, one of which is within the coverage of the policy, even if the others are not. *Id.*

¶ 81    On the other hand, the duty to indemnify only arises where the insured's activity and the resulting damages actually fall within the coverage of the policy. *American Family Mutual Insurance Co. v. Niebuhr*, 369 Ill. App. 3d 517, 521 (2006). When an insured settles an underlying claim, it must show that the settlement was made in reasonable anticipation of liability for an otherwise covered loss. *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 625 (1994). In cases where an insured enters into a settlement that disposes of both covered and non-covered claims, the insurer's duty to indemnify encompasses the entire settlement if the covered claims were "a primary focus of the litigation." *Commonwealth Edison Co. v. National Union Fire Insurance Co.*, 323 Ill. App. 3d 970, 982 (2001); see *Federal Insurance Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277, 289 (2009) (following the "primary focus" standard articulated in *Commonwealth Edison*, the court found that the insured was not required to allocate liability within a settlement that contained both a covered consumer fraud claim and a noncovered warranty claim); *Santa's*

*Best Craft, LLC v. St. Paul Fire & Marine Insurance Co.*, 611 F.3d 339, 352 (7th Cir. 2010) (under Illinois law, insurer must reimburse settlement if a "primary focus" of the claims that were settled was a potentially covered loss). Conversely, if the "primary focus" of the claims that were settled is not a covered loss, then the insurer is not required to reimburse the settlement. *Id.*

¶ 82   In this case, the parties do not dispute that Rosalind settled the *Pollack* suit in reasonable anticipation of liability. Thus, the issue currently before us is whether the settlement contained any claims that were covered by Lexington's and Landmark's respective policies, and, if so, whether such claims were a "primary focus" of the settlement.

¶ 83   Professional liability policies are "designed to insure members of a particular professional group from the liability arising out of a special risk such as negligence, omissions, mistakes and errors inherent in the practice of the profession." 7A John Appleman, Insurance Law and Practice § 4504.01, at 310 (Bender rev. ed. 1979). Illinois courts have adopted an expansive definition of "professional service" in the context of such policies. *State Street Bank & Trust Co. of Quincy, Illinois v. INA Insurance Co. of Illinois*, 207 Ill. App. 3d 961, 967 (1991). Professional service "refers to any business activity conducted by the insured which involves specialized knowledge, labor, or skill, and is predominantly mental or intellectual as opposed to physical or manual in nature." *Id.* (holding that a bank's decision to collect on a defaulted loan was a "professional service" because it involved the exercise of business judgment in conducting the bank's principal business activity).

¶ 84   The application of this definition is illustrated by the contrasting results in *National Fire Insurance Co. of Hartford v. Kilfoy*, 375 Ill. App. 3d 530 (2007), and *American Family Mutual Insurance Co. v. Enright*, 334 Ill. App. 3d 1026 (2002), both of which involved allegations of negligent hiring in a health care context. In *Enright*, an ultrasound technician sexually assaulted a patient, and the patient brought suit against the technician's employer for negligent hiring. *Id.* at 1028. The *Enright* court held that a professional liability carrier had no duty to defend the suit. *Id.* at 1035. It explained that the suit did not involve "professional services" because the insured's failure to perform a criminal background check before hiring its technician had nothing to do with the exercise of professional training, skill, experience, or knowledge as a sonographer. *Id.*; see also *Crum & Forster Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 394 (1993) (real estate professional liability policy did not cover allegations of intentional business torts and unfair competitive practices that were "ancillary to the performance of real estate services").

¶ 85   By contrast, in *Kilfoy*, a patient was injured as a result of eye surgery and brought suit against the surgical facility. *Kilfoy*, 375 Ill. App. 3d at 531. She alleged that the doctor who performed her preoperative evaluation did not properly advise her as to the risks and benefits of the surgery and, in fact, was not qualified to do so. *Id.* Her complaint also contained language alleging that the facility was " 'negligent in its hiring, *administrative* supervision, and *business* operation.' " (Emphases in original.) *Id.* at 533. Nevertheless, the *Kilfoy* court found that the complained-of activities constituted "professional services" for insurance purposes. *Id.* at 536. In doing so, the court explained that, unlike in *Enright*, the allegations giving rise to the underlying plaintiff's negligent hiring claim did not involve a mere failure to take administrative precautions. *Id.* at 535. Rather, they implicated the facility's failure to employ specialized knowledge and skill to ensure that prospective employees were qualified to render medical services. *Id.* at 535-36. The *Kilfoy* court concluded that "[t]hese allegations

- 17 -

go to the heart of [the insured's] principal business operation and the way in which [the insured] exercises business judgment." *Id.* at 536.

¶ 86      In the present case, although the underlying plaintiffs alleged many different causes of action, the genesis of all of those claims was the decision by Rosalind's IRB to shut down the Springer vaccine program. See *Crum & Forster*, 156 Ill. 2d at 394 (in determining liability under professional liability policies, courts do not rely upon ancillary allegations but consider the genesis from which the claims arose). In making this decision, the IRB purported to be acting upon its specialized medical knowledge, citing safety concerns and a lack of demonstrable efficacy of the treatment. This is consistent with the general function of an IRB of a medical institution such as Rosalind. An IRB is responsible for ensuring the safety of human subjects and for establishing informed consent protocols. *Grethe v. Trustmark Insurance Co. (Mutual)*, 881 F. Supp. 1160, 1162 (N.D. Ill. 1995). As Landmark argues in its brief, these are medical functions that require judgment aimed at protecting patients. Thus, Rosalind's exercise of judgment in this regard constitutes professional service. See *State Street*, 207 Ill. App. 3d at 967.

¶ 87      Lexington argues that the *Pollack* complaint did not allege that the termination of the study was an exercise of medical judgment. Although it contains no explicit statement to this effect, the complaint actively frames itself in such terms. Its preliminary statement alleges that Rosalind violated a "cardinal principle of the medical profession *** that, once care is undertaken, patients may not be abandoned." The complaint further alleges that Rosalind failed to "comport with their professional responsibilities as articulated in the Code of Medical Ethics" by discontinuing care. A health care provider's violation of professional responsibilities is an error that is inherent in the practice of medicine, not a mere administrative action. See Appleman, *supra* § 4504.01, at 310.

¶ 88      Lexington next argues that, according to the *Pollack* complaint, the IRB's purported reasons for discontinuing the Springer vaccine study were "a ruse" and that the decision was actually made on financial, not medical, grounds. However, what would otherwise be an exercise of medical judgment does not stop being one merely because the decision was motivated by nonmedical concerns. *Kilfoy*, 375 Ill. App. 3d at 535-36, is instructive in this regard. In holding that the insured's hiring decision constituted a "professional service," the *Kilfoy* court did not inquire into the motivation behind the hiring decision. *Id.* Rather, the *Kilfoy* court looked to the nature of the decision itself as one that required specialized medical knowledge and skill. *Id.* Similarly, in the present case, the IRB's decision to discontinue the Springer vaccine program "go[es] to the heart of [the insured's] principal business operation and the way in which [the insured] exercises business judgment" (*id.* at 536), even though the underlying complaint alleges that such business judgment was exercised improperly.

¶ 89      Lexington additionally argues that the *Pollack* complaint does not implicate professional services because the vaccine study was a research program, not a form of medical treatment. In this regard, Lexington cites the consent form signed by the patients, which stated that "[t]he procedures involved in this research are not part of my routine treatment and are not intended to potentially benefit my personal health." However, notwithstanding the language of this form, the *Pollack* complaint clearly alleges that the Springer vaccine treatments were medically beneficial to the patients and that discontinuing those treatments would cause them physical harm. Specifically, it states that the treatments were "life-saving" and "sustained

these women for many years," citing an alleged March 3, 1999, statement by Rosalind that the Springer vaccine " 'has helped save and prolong the lives of many cancer patients.' " It further alleges that Rosalind's decision to end the program "significantly increases the likelihood that the patients will suffer a recurrence of cancer," since the vaccine treatments must be continued through a patient's lifetime to maintain their effectiveness. In addition, the complaint states that one of the plaintiffs "firmly believes that the T/Tn injections have saved her life. She knows that [Rosalind's] improper and unjustified termination of the vaccine program places her life at substantial and immediate risk." Based upon this language, it is apparent that the underlying complaint alleges a discontinuation of medical treatment and physical harm resulting therefrom.

¶ 90 Rosalind, meanwhile, agrees with our conclusion that the *Pollack* complaint implicates professional services, but it argues that there are numerous other causes of action in the complaint that do not fall under the medical malpractice exclusion in the Landmark Policy. In particular, it argues that the allegations of misrepresentation and fraud concern Rosalind's administrative decisions rather than any provision of professional services. We disagree. As previously noted, in determining liability under professional liability policies, courts do not rely upon ancillary allegations but consider the genesis from which the claims arose. *Crum & Forster*, 156 Ill. 2d at 394. In this case, the genesis of all the claims, including the misrepresentation and fraud claims, was Rosalind's termination of the Springer vaccine program; the plaintiffs' misrepresentation and fraud claims are inextricably linked to that decision. *Cf. Ashley v. Evangelical Hospitals Corp.*, 230 Ill. App. 3d 513, 524 (1992) (indemnity claim "arose out of patient care" and was subject to medical malpractice statute of repose where it involved allegedly wrongful administrative actions that were "inextricably linked" to medical malpractice claim). In this regard, *Kilfoy* is once again on point. In *Kilfoy*, although the plaintiff's complaint contained language alleging that the insured facility was " 'negligent in its hiring, *administrative* supervision, and *business* operation' " (emphases in original) (*Kilfoy*, 375 Ill. App. 3d at 533), the court did not find this language to be controlling. Instead, it found that the administrative actions at issue were premised upon the insured's exercise of medical judgment in its hiring decisions. *Id.* at 536. Likewise, although the *Pollack* complaint contains various allegations relating to Rosalind's administrative and business actions, it focuses upon how these actions led to the allegedly wrongful decision to end the Springer vaccine program and stop providing "life-saving" vaccine to the plaintiffs.

¶ 91 Based upon the foregoing, we find that the "primary focus" of the underlying complaint consists of activity involving specialized medical knowledge, thus bringing it within the ambit of Lexington's professional liability policies, as well as the medical malpractice exclusion in Landmark's policy. *Kilfoy*, 375 Ill. App. 3d at 535-36 (citing *State Street*, 207 Ill. App. 3d at 967); *Commonwealth Edison*, 323 Ill. App. 3d at 982 (insurer has a duty to indemnify settlement if the covered claims were a primary focus of the litigation). Unlike in *Enright*, 334 Ill. App. 3d at 1035, the decision at issue in this case was not merely an administrative decision that did not implicate medical judgment but, rather, involved the medical judgment of Rosalind's IRB as to the safety and efficacy of the Springer vaccine as used on Rosalind's patients. See *Grethe*, 881 F. Supp. at 1162.

### 3. "Pain and Suffering" Damages

¶ 93    As has been mentioned, the trial court ruled that Landmark was not responsible for the $500,000 of the underlying settlement that was "to compensate the plaintiffs for pain and suffering," finding that it came within the bodily injury exclusion of the Landmark Policy. Lexington contests this ruling, arguing that regardless of how the damages were labeled in the settlement agreement, they were actually intended as attorney fees for the plaintiffs' lawyers. In support, Lexington relies on Vogt's deposition testimony that the $500,000 "was [plaintiffs'] identification of where–how the money was supposed to be separated, because they were going to get–the lawyers wanted their fees to be staying outside the trustee monies." According to Lexington, Vogt's testimony "established that the payment was made to remedy Rosalind's false representations and its administrative decision to terminate the study."

¶ 94    Landmark argues that Vogt's testimony is inadmissible in this regard, citing *Meyer v. Marilyn Miglin, Inc.*, 273 Ill. App. 3d 882, 888 (1995), for the proposition that if the terms of a contract are unambiguous, the parties' intent must be ascertained exclusively from the express language of the contract without parol evidence. However, the parol evidence rule only binds the parties to the contract, and " 'parol evidence can be used to vary or contradict a contract when the litigation is between a party to the contract and a stranger thereto.' " (Internal quotation marks omitted.) *Quality Lighting, Inc. v. Benjamin*, 227 Ill. App. 3d 880, 887 (1992) (quoting *General Casualty Co. v. Elam*, 8 Ill. App. 3d 215, 225 (1972)).

¶ 95    More importantly, though, even if we were to assume that Lexington is correct in its assertion that the $500,000 payment was made to remedy Rosalind's decision to terminate the Springer vaccine program, it would only serve to bring the $500,000 payment within the ambit of the medical malpractice exclusion in the Landmark Policy. As has been fully discussed, Rosalind's decision to terminate the program was an exercise of medical judgment that falls within the category of "professional services" for purpose of Landmark's policy. See *State Street*, 207 Ill. App. 3d at 967. Therefore, we find that the trial court did not err in ruling that Landmark was not responsible for the $500,000 payment.

### 4. Rosalind's Failure to Obtain Consent for Settlement

¶ 97    Lexington's next contention is that it has no duty to indemnify Rosalind because Rosalind failed to obtain Lexington's consent for the underlying settlement. In response, Rosalind contends that Lexington has waived this defense to coverage because it was aware that settlement negotiations were ongoing in the *Pollack* suit but failed to raise the issue of consent to settle until after Rosalind had executed a final settlement agreement.

¶ 98    Both of Lexington's policies contain a voluntary payment provision stating that, without Lexington's consent, the insured shall not "except at [its] own cost, voluntarily make a payment, assume any obligation, or incur any expense." Moreover, as a general rule, absent a breach of the duty to defend, an insured must obtain the consent of its insurer before settling with an injured plaintiff. *Guillen v. Potomac Insurance Co. of Illinois*, 203 Ill. 2d 141, 149 (2003) (citing *Alliance Syndicate, Inc. v. Parsec, Inc.*, 318 Ill. App. 3d 590, 600 (2000) (where insurer informed the insured that it would not participate in settlement discussions, and the insured nevertheless proceeded to settle the case without the insurer's consent, insured was not entitled to indemnity from the insurer)). Lexington argues that Rosalind was

aware that it did not have Lexington's consent at the time it settled the underlying suit and is therefore not entitled to indemnity from Lexington.

¶ 99    Rosalind claims that Lexington has waived this defense by failing to assert it in a timely fashion. Waiver is an equitable principle that is invoked to further the interests of justice where a party either relinquishes a known right or acts in such a manner that would warrant an inference of such relinquishment. *Mollihan v. Stephany*, 52 Ill. App. 3d 1034, 1041 (1977). A long delay in asserting a policy defense or disclaimer may constitute a waiver of that defense where there is evidence of prejudice to the insured. *Vasilakis v. Safeway Insurance Co.*, 46 Ill. App. 3d 369, 374 (1977) (citing *Kenilworth Insurance Co. v. McDougal*, 20 Ill. App. 3d 615, 620 (1974) (stating that "an insurer may waive his right to assert nonliability if his actions have prejudiced the insured")); see *State Farm Mutual Automobile Insurance Co. v. Gray*, 211 Ill. App. 3d 617, 621, 623 (1991) (insurer waived coverage defense where it was aware of defense but chose not to raise it, leading insureds to believe that coverage was not challenged). Moreover, "[s]trong proof is not required to show a waiver of a policy defense, but only such facts as would make it unjust, inequitable or unconscionable to allow the defense to be interposed." *Vasilakis*, 46 Ill. App. 3d at 374. We note at this juncture that in its reply brief, Lexington does not even acknowledge Rosalind's contention of waiver, much less attempt to address it.

¶ 100    In support of its contention of waiver, Rosalind cites the deposition testimony of Bergeson and Vogt regarding the communications they had with Lexington during and after the settlement negotiations in the underlying suit. In her deposition, Bergeson testified that on October 27, 2004, while the settlement negotiations were ongoing, she spoke with Vogt and expressed concern that they not move forward with a settlement agreement before speaking with Lexington. Bergeson attempted to call Bonthala, Lexington's claims representative, but was only able to reach his voice mail. She left him two messages asking him to call her back immediately. Bonthala never responded to her. However, Vogt was able to reach Bonthala by phone, update him on the progress of the settlement negotiations, and alert him to a possible settlement.

¶ 101    Meanwhile, the settlement negotiations continued, and later that day, the parties reached a settlement in principle. Bergeson testified that this settlement was conditioned on the approval of Rosalind's board of trustees (Board).

¶ 102    Two days later, on October 29, 2004, Lexington sent its first and only reservation of rights letter to Rosalind. In that letter, Lexington mentioned various possible coverage defenses, but it did not indicate that it intended to pursue a voluntary payment defense based on the settlement agreement. Bergeson testified that Dr. Welch, Rosalind's president and CEO, would have been made aware of that letter before he presented the proposed settlement to the Board. At the Board meeting in November 2004, the Board was advised that Lexington was aware of the settlement and that Rosalind intended to pursue coverage from them. It was also informed of Lexington's reservation of rights and were not told that coverage was assured. However, according to Bergeson, the Board was not informed of "coverage problems," because "the letter we had reviewed did not, after Lexington knew about the settlement, never apprised the university that it had a problem with the settlement." The Board then voted to approve the settlement, and it was subsequently executed on December 4, 2004.

¶ 103    In his deposition, Vogt testified about his phone conversation with Bonthala on October 27, 2004. Vogt told Bonthala that the *Pollack* plaintiffs wanted a monetary settlement and asked if Lexington would contribute to that settlement. Bonthala replied that he "was not sure," since he had sent the matter out for a coverage opinion and he was waiting for the coverage opinion to come back. However, according to Vogt, Bonthala did not say that there was no coverage, and he did not disclose any basis on which Lexington might reserve its right to deny coverage.

¶ 104    Based upon these facts, we agree with Rosalind that the trial court did not err in finding that Lexington waived its voluntary payment defense. After it learned that settlement negotiations were ongoing in the *Pollack* action, Lexington had multiple opportunities to raise the issue of consent to settle or a voluntary payment defense, but it declined to do so until after Rosalind had executed the final settlement agreement. In particular, in its reservation of rights letter sent on October 29, 2004, although Lexington mentioned various potential defenses to coverage, it never mentioned a voluntary payment defense and never told Rosalind not to settle the case. Based upon the fact that "Lexington *** never apprised the university that it had a problem with the settlement" (to use Bergeson's words), the Board approved the settlement. Under such circumstances, we agree with the trial court that it would be inequitable to allow Lexington to raise the voluntary payment defense now. See *Vasilakis*, 46 Ill. App. 3d at 374 (waiver of a policy defense will be found upon a showing of "such facts as would make it unjust, inequitable or unconscionable to allow the defense to be interposed").

¶ 105                              5. Exhaustion of the Self-Insured Retention

¶ 106    Lexington's final contention on the issue of coverage is that its duty to defend was not triggered because it was not aware of the potential exhaustion of the $100,000 self-insured retention in the Lexington Primary Policy. However, Lexington waived any argument on this point by voluntarily undertaking the defense of and appointing counsel to defend the *Pollack* suit. In any case, Lexington provides no case law in support of the proposition that an insurer who appoints counsel for its insured may later avoid coverage because it did not know of the exhaustion of a self-insured retention. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *People v. Ward*, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited").

¶ 107                              C. Rosalind's Bad-Faith Claim

¶ 108    We next turn to Rosalind's cross-appeal against Lexington, in which Rosalind contends that the trial court erred in rejecting its claim of bad faith against Lexington. Rosalind argues that Lexington's "vexatious and unreasonable" conduct in its handling of the *Pollack* suit and settlement constitutes both statutory bad faith under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2012)) and common law bad faith.

¶ 109    At the outset, Lexington contends that Rosalind's cross-appellant brief violates Supreme Court Rule 341(h)(6) because it does not contain a statement of facts. Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013) (appellant's brief must contain a statement of facts that "contain[s] the facts necessary to an understanding of the case"). This argument is without merit. Rosalind has included a statement of facts in its appellee brief, which is bound in the same volume as

its cross-appellant brief, and the facts contained therein apply equally to Rosalind's response to Lexington and to its cross-appeal.

¶ 110    We therefore turn to consider Rosalind's claim that Lexington's actions constitute statutory bad faith under section 155 of the Illinois Insurance Code. That section provides, in relevant part:

> "In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus [certain penalties.]" 215 ILCS 5/155(1) (West 2012).

In determining whether an insurer's conduct was "vexatious and unreasonable," the court must consider the totality of the circumstances. *Green v. International Insurance Co.*, 238 Ill. App. 3d 929, 935 (1992). Neither the length of time, the amount of money involved, nor any other single factor taken by itself is dispositive. *Id.* Moreover, section 155 fees and penalties are not awarded simply because the insurer refuses to settle or was unsuccessful in litigation. *Deverman v. Country Mutual Insurance Co.*, 56 Ill. App. 3d 122, 124 (1977). Rather, "[i]t is the attitude of the defendant which must be examined." *Norman v. American National Fire Insurance Co.*, 198 Ill. App. 3d 269, 304 (1990). Where a party's request for sanctions under section 155 involves a mixed question of fact and law, we review the trial court's ruling for an abuse of discretion. *Baxter International, Inc. v. American Guarantee & Liability Insurance Co.*, 369 Ill. App. 3d 700, 703 (2006) (citing *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 160 (1999)).

¶ 111    Under the facts of this case, we cannot say that the trial court abused its discretion in denying relief under section 155. After learning of the filing of the *Pollack* suit, Lexington appointed Vogt to serve as counsel for Rosalind. Rosalind argues that Lexington's conduct in this regard was unreasonable because it did not inform Rosalind of a conflict of interest. See *Mobil Oil Corp. v. Maryland Casualty Co.*, 288 Ill. App. 3d 743, 756 (1997) ("A conflict of interest exists if the interests of the insurer would be furthered by providing a less than vigorous defense to the allegations against the insured."). It states that Lexington had an interest in settling the case on grounds that would not be covered under its policies, which would obviously run counter to Rosalind's interests. However, as discussed, there is no indication in the record that Vogt's representation was defective or that independent counsel would have conducted the defense any differently. On the contrary, the record shows that Rosalind maintained control of the defense via the involvement of its general counsel, Bergeson.

¶ 112    Rosalind next asserts that Lexington's conduct was "vexatious and unreasonable" because it "maneuvered" Rosalind into a settlement while lulling it into believing that coverage existed. This assertion is not borne out by the record. On the contrary, it was Vogt's testimony that Bergeson was the one who convinced the plaintiffs to take a $3 million settlement, down from their earlier demand of $4 million. Bergeson herself stated that she was engaged in "ongoing dialogue" with Vogt regarding the possibility of settlement, and she was present for at least a significant portion of the settlement negotiations. Moreover, on October 29, 2004, before Rosalind's Board had finalized the settlement agreement, Lexington sent its reservation of rights letter to Rosalind. Prior to voting to approve the

settlement agreement, the Board was informed of Lexington's reservation of rights and, according to Bergeson, they were not assured that coverage would be provided. Based upon these facts, the trial court correctly concluded that the timing of Lexington's reservation of rights letter did not constitute bad faith.

¶ 113    In support of its statutory bad faith claim, Rosalind relies principally upon *La Grange Memorial Hospital v. St. Paul Insurance Co.*, 317 Ill. App. 3d 863 (2000), and *Williams v. American Country Insurance Co.*, 359 Ill. App. 3d 128 (2005). However, both of these cases are distinguishable because they involve conduct by the insurer that is significantly more egregious than in the case at hand.

¶ 114    In *La Grange*, the insurer received a notice of a claim on April 5, 1990. *La Grange*, 317 Ill. App. 3d at 868. The *La Grange* court later found that under the facts, the insurer "[c]learly" had a duty to defend. *Id.* at 870. Nevertheless, the insurer did not defend under a reservation of rights or file a declaratory judgment action. *Id.* at 868. Instead, in or about December 1990, it destroyed the subject policy. *Id.* Five years later, on July 25, 1995, the insured sent the insurer another letter demanding defense and indemnification for the underlying claim. *Id.* The insurer apparently did not respond, and on September 14, 1995, the insured brought suit against the insurer. *Id.* Only after commencement of the action did the insurer write a letter in which it refused to defend the insured. *Id.* Under those facts, the *La Grange* court found that it was not an abuse of discretion to award penalties under section 155. *Id.* at 873.

¶ 115    *La Grange* is distinguishable from the instant case in two ways. First, the *La Grange* insurer waited more than five years to send a denial of coverage to its insured. Second, its response to being notified of the underlying suit was to destroy the policy at issue. By contrast, in the present case, Lexington's response to learning of the *Pollack* suit was to appoint counsel to defend its insured. In addition, it sent a reservation of rights letter to Rosalind approximately three months after the underlying suit was filed. Although this notification could, perhaps, have been sent sooner, it does not rise to the level of vexatious and unreasonable conduct found in *La Grange*.

¶ 116    The other case cited by Rosalind, *Williams*, 359 Ill. App. 3d 128, involves a dispute between a taxicab driver and his insurer. The underlying plaintiff was injured in a taxicab incident and sued both the driver and the taxicab company. *Id.* at 131. The driver and the company were covered by the same insurer. *Id.* The insurer undertook their defense and sent the driver a reservation of rights letter, but it did not inform him of any conflict of interest. *Id.* at 131-32.

¶ 117    The *Williams* court found that a conflict of interest existed between the driver and the company, because it would be in the driver's interest to be found an agent of the company (and thus spread liability to them), while the company's interest was the opposite. *Id.* at 139. Moreover, the court found that the driver suffered actual prejudice from this undisclosed conflict of interest. *Id.* at 141. The insurer maintained control of the driver's defense for three years, during which time it "had the opportunity to 'mold' discovery in its behalf to the prejudice of [the driver]." *Id.* Specifically, on multiple occasions, the attorney retained by the insurer to represent the driver filed documents indicating that the driver was not an agent of the company. *Id.* at 140. The *Williams* court held that this conduct was sufficiently "vexatious and unreasonable" to warrant penalties under section 155. *Id.* at 142.

¶ 118    Rosalind argues that *Williams* is analogous to the instant case because Vogt, like the appointed counsel in *Williams*, did not inform Rosalind of any conflict of interest. However, in *Williams*, appointed counsel took active steps to harm his own client's defense because of the conflict of interest, a fact that is notably absent here. As mentioned, there is no indication in the record that Vogt's representation of Rosalind was defective. Furthermore, the length of time involved in *Williams* is significantly longer than in the present case. The *Williams* court considered it significant that the insurer had three years to mold discovery in its favor. By contrast, in the present case, the settlement in principle was reached approximately three months after the filing of the action. Accordingly, neither *Williams* nor *La Grange* supports reversal of the trial court's decision on this issue.

¶ 119    We next consider Rosalind's contention that Lexington's actions constitute bad faith under the common law. Illinois courts have held that "an insurer is liable for the full amount of a judgment or settlement, even if it exceeds the policy limits, if the insurer acted in bad faith by refusing to defend its insured." *Conway v. Country Casualty Insurance Co.*, 92 Ill. 2d 388, 398 (1982) (citing *Reis v. Aetna Casualty & Surety Co. of Illinois*, 69 Ill. App. 3d 777, 790 (1978)); see also *Guillen v. Potomac Insurance Co.*, 323 Ill. App. 3d 121, 137 (2001) (where settlement amount exceeded policy limits, insurer would only be held liable for full amount upon a clear showing that it acted in bad faith). Bad faith is "the semantic equivalent of 'vexatious and unreasonable' conduct." *Emerson v. American Bankers Insurance Co. of Florida*, 223 Ill. App. 3d 929, 936 (1992).

¶ 120    In this case, for the reasons stated above, Lexington's conduct does not rise to the level of being "vexatious and unreasonable." Accordingly, we find that the trial court did not err in rejecting Rosalind's common law bad faith claim.

¶ 121                                      III. CONCLUSION

¶ 122    For the foregoing reasons, we affirm the trial court's grant of summary judgment for Rosalind and against Lexington on counts I and VI of the complaint, finding that Lexington owes a duty to pay for Rosalind's defense and settlement costs under the Lexington Primary Policy and the Lexington Excess Policy. We reverse the trial court's grant of summary judgment for Rosalind and against Lexington on count III, which is Rosalind's estoppel claim. We additionally reverse the trial court's grant of summary judgment for Rosalind and against Landmark on count VII, and we direct the court to enter summary judgment for Landmark on that count. Concomitantly, we reverse the trial court's denial of summary judgment for Landmark on Lexington's cross-claim against Landmark and direct the court to enter summary judgment for Landmark. Finally, we affirm the trial court's grant of summary judgment on count V, Rosalind's bad faith claim. Because we find that Landmark has no duty to indemnify Rosalind for the *Pollack* settlement, we need not consider Landmark's claim regarding prejudgment interest or Rosalind's cross-appeal against Landmark.

¶ 123    Affirmed in part and reversed in part; cause remanded.